CASE 22—PETITION ORDINARY—OCTOBER 27.

## Hetterman Bros. & Co. v. Powers, Etc.

| 102 | 133 |
| 106 | 892 |

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. TRADE MARKS—LABEL OF LABORERS' UNIONS.—A laborers' union composed of members who are engaged in a skillful employment may so designate the result of their labor by labels as to entitle them to the fruits of their skill, when it is a source of pecuniary profit to them, although they may not own the property labeled and are not in business for themselves in the ordinary sense; and they will be protected by the courts in the exclusive use of the same.

2. SAME.—The label is not objectionable, because on it there is a certificate that the cigars were made by first-class workmen belonging to "an organization opposed to inferior, rat-shop, coolie, prison or filthy tenement-house workmanship;" that certificate

is not in conflict with the rule that a lawful trade mark must avoid transgressing the rules of morality and public policy.

HUMPHREY & DAVIE FOR APPELLANT.

1. The plaintiffs do not come into court with clean hands, because they are members of an organization which was at the time engaged in boycotting the appellees, and parties so engaged in an illegal proceeding will not be heard in equity. Nash v. Page, 80 Ky., 539; State v. Stuart, 59 Am. Reps., 710 and note; Sherry v. Perkins, 9 Am. State Reps., 689; Spies v. The People, 3 Am. State Reps., 486.

2. The label on its face shows, and the evidence confirms, that its purpose was to stigmatize and injure all cigar makers who were not members of that union irrespective of their character; the courts will not protect an organization in the use of such a label. McVey v. Brendel, 144 Pa. St., 235.

3. Plaintiffs not having shown any property right in the labels as a trademark, or otherwise, and not having shown that they are engaged in any trade which has been unlawfully interfered with, can not maintain the action. Schneider v. Williams, 44 N. J. Eq., 491 (14 Atl. Rep., 812); Cigar Makers' Union v. Conham, 40 Minn., 243 (41 N. W. Rep., 943); Weener v. Brayton, 152 Mass., 101 (25 N. W. Rep., 46).

A. E. WILLSON FOR APPELLEES.

1. The purposes of the International Cigar Makers' Union of America, as set forth in its constitution, and as shown in this case, are lawful and in accord with the public policy of Kentucky, the United States, and the several States. Kentucky Statutes, secs. 4749 to 4755; Act to Legalize the Incorporation of National Trades' Unions, Suppl. U. S. Rev. St., 498; Indiana Laws, 1894, chap. 116, p. 317; Illinois Laws, 1891, p. 202; Iowa Laws, 1892, chap. 36, p 63; Kansas Laws, 1891, chap. 219, p. 263; Maine Pub. Laws, chap. 114, p. 124; Maryland Laws, 1892, chap. 357, p. 500; Michigan Pubs. Acts, 1891, p. 39; Minnesota Gen'l Laws, 1893, chap. 24, p. 126; Missouri Laws, 1893, p. 260; Nebraska Laws, 1891, chap. 15, p. 353; New York Act, June 6, 1884; Ohio Laws, 1890, p. 141; Wisconsin Laws, 1891, chap. 280; p. 353; Strasser v. Moonelis, 55 N. Y. Sup. Ct., 197; Bloete v. Simon, 49 Abb. N. C., 88 (N. Y.); Cohns v. People, 149 Ill., 486; State v. Hagan, 6 Ind. Ap., 169; Carson v. Ury 39 Fed. Rep., 777; People v. Fisher, 50 Hun., 552.

2. An association whose members are engaged in the manufacture of cigars may lawfully adopt a trademark, or label, for the use

and benefit of its members, to be applied to the cigars produced by them to distinguish them from those purchased by others, and to secure to them the benefit of the superior reputation of their cigars in the market, resulting from their superior skill and care in their manufacture, although they be not the owners of the cigars when manufactured; and may prevent the use of such label by others. Avery v. Meikle, 8 Ky L. R., 73; Metcalfe v. Brand, 86 Ky., 351; McLane v. Fleming, 96 U. S., 245; Croft v. Day, 7 Beavan, 84; Witherspoon v. Currie, 5 H. L. Case, 508; Slixo v. Provezendo, L. R. I. Chan., 195; Thompson v. Winchester, 19 Pick., 214; Perry v. Truefitt, 6 Beavan, 66; Anheuser-Busch Brewing Ass'n v. Piza, 24 Fed. Rep., 149; Sawyer v. Horn, 4 Hughes, 239; Dixon Crucible Co. v. Giggenheim, 2 Brewster, 321; Peltz v. Eichele, 62 Mo., 171; Hostetter v. Adams, 10 Fed. Rep., 838; Wolf v. Hart, 4 Vict. L. R. (Austral.), 135; Newman v. Alford, 51 N. Y., 189; Burton v. Stratton, 12 Fed. Rep., 696; Browne Chemical Co. v. Myer, 31 Fed. Rep., 453; Browne on Trade Marks, secs. 43, 44, 890, 124 and 127; Foster, &c., Co. v. Blood Balm Co., 77 Ga., 316; Frazer Lub. Co. v. Frazer, 121 Ill., 147; Smail v. Sanders, 118 Ind., 105; Carson v. Ury, 39 Fed. Rep., 777; Cleveland Store Co. v. Wallace, 52 Fed. Rep. 431.

8. There is a definite property in human skill and reputation, and the reputation of the use of skilled labor in the manufacture of a particular product not only augments its value and commands for it a market, but of necessity induces a more extended employment of such labor and an increase in the scale of wages paid for it. Cohn v. People, 149 Ill., 486; Strasser v. Moonelis, 55 N. Y. Sup. Ct., 197; Block v. Simon, 19 Abb., New Cases, 88; State v. Hagan, 6 Ind. Ap., 169; People v. Fisher, 50 Hun., 552; Allen v. McCarthy, 37 Minn., 349.

BURTON VANCE OF COUNSEL ON SAME SIDE.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

The appellants were manufacturers and dealers in cigars in Louisville, Ky., and without right or claim of right used on boxes of cigars manufactured and sold by them the blue label of the Cigar Makers' International Union of America, a *fac simile* of which is as follows:

Hetterman Bros. & Co. v. Powers, etc.

Thereupon appellees, Powers, Kieffer and Wopprice, suing for themselves and all their associates and fellow members in the Cigar Makers' International Union and the Cigar Makers' Protective Union No. 32, and joining these two organizations also as plaintiffs, brought this action to prevent this alleged wrongful use of the label.

The International Union, embracing, according to the petition, some——members and the local union some——members are voluntary, unincorporated labor organizations, composed solely of practical cigar makers. They are working men who do not own the product of their labor, being exclusively wage workers. The purpose of these unions, as said in the petition, is generally to maintain a high standard of workmanship and secure fair wages to cigar makers, to elevate the material, moral and intellectual welfare of the membership and by legitimate, organized effort to secure laws prohibiting labor by children under fourteen years of age, the abolition of the "truck" system, the tenement house cigar manufacture and the manufacture of cigars by prison convict labor. Other praiseworthy objects are set out which need not be detailed. It is further averred that, for the purpose of designating the cigars made by members of the union

the label in controversy was adopted and extensively used as a trade-mark or certificate of identification. And, when pasted on the outside of cigar boxes containing cigars made by members of the union, it is a guarantee that the cigars are made by first-class workmen, members of the Cigar Makers' Union, etc., etc.; that because the members receive fair wages and were thus able to furnish good workmanship, the cigars so labeled commanded a higher price than did similarly looking cigars not so labeled; that the label was, therefore, a source of great profit and benefit to the appellees and other members of the union.

The appellants, for defense, do not deny the use of the label as charged in the petition, but it is insisted by them that this label does not possess any of the elements of a trade-mark; that the appellees are engaged in no trade, having nothing to sell, and, therefore, nothing to protect by a trade-mark; that none of them are engaged in the business of selling cigars; they are "simply workmen employed by other people making cigars, first by one person and then another, and those persons sell the cigars;" that the plaintiffs, therefore, "have not shown any property right in the label as a trade-mark or otherwise." Moreover, that the membership is an ever changing one, constantly varying in numbers, composed of a few thousand to-day and many thousand to-morrow—"a shifting crowd." That the plaintiffs, therefore, are not qualified to sue and have in fact no legal rights that can be made the subject of a suit.

Moreover, it is urged that the plaintiffs do not come into court with clean hands; that they are members of an organization lately engaged in boycotting the defendants and at-

tempting to ruin their business; that the label itself can not be approved, either in law or morals, as it denounces other cigars than union-made ones as inferior and unwholesome, and the product of filthy tenement houses or made by coolies and convicts.

And, first, we may admit that the label is not used as a trade-mark in the ordinary sense of that word. It is not a brand put on the goods of the owner to separate or distinguish them from the goods of others, but we can not agree on that account that it does not represent a valuable right which may be the subject of legal protection. Why may not those engaged in skillful employment so designate the result of their labor as to entitle them to the fruits of their skill when it is admittedly a source of pecuniary profit to them? And this, though they may not own the property itself?

They are not, it is true, "in business" for themselves in the ordinary sense, but they have property rights nevertheless. They may not select a label and be protected in its use apart from its connection with some commodity; but they not only select it in this instance, they apply it to property, and it does not at all matter that the tangible property is that of another

In order to get the benefit of the superior reputation of cigars made by them the appellees select and apply this label as a distinguishing brand or mark. And it would be strange if this thing of value, this certificate of good workmanship and which makes the goods made by them sell and thus increases demand for their work, be entitled to no protection, because those making the selection and application

are not business men, engaged in selling cigars of their own. The man who is employed for wages is as much a business man as his employer in that larger sense in which the word "business" has come to be used by statesmen and legislators.

In a number of the States laws have been enacted giving protection to the men engaged in the business of working for wages, and their right of organizing and selecting appropriate symbols to designate the results of their handiwork is recognized and ordained to be the subject of lawful protection by the courts. Thus in this State, in April, 1890, a law was enacted by the General Assembly providing that "every union or association of working men or women adopting a label, mark, name, brand or device, intended to designate the product of the labor of the members of such union, shall file duplicate copies of such label in the office of the secretary of State, who shall then give them a certificate of the filing thereof, and that every such union may, by suit in any of the courts of the State, proceed to enjoin the manufacture, use, display, etc., of counterfeits or imitations of such labels, etc., on goods bearing the same, and that the court having jurisdiction of the parties shall grant an injunction restraining such wrongful manufacture, use, etc., of such label," etc.

This suit was filed before the adoption of this statute, but it indicates the policy of the law, the growth or expansion and perhaps the creation of legal remedies hardly known to ancient trademark law.

The learned chancellor below, in an exhaustive opinion reviewing all the authorities, among other things, said, and we

can say it no more clearly, that "the known reputation of a particular kind of skilled labor employed in the development of a particular product or class of products determines, to a large degree, the value or price of such products when put on the markets. To stamp or label a commodity as the product of a particular kind or class of skilled labor determines the demand for and the price of such product or commodity. The marketable price of a commodity influences the scale of wages paid for its manufacture. The higher the price, the higher the wages paid; hence it is indisputable that the employe whose skilled labor, in the production of a particular commodity, creates a demand for the same, that secures for him higher remunerative wages, has as definite a property right to the exclusive use of a particular label, sign, symbol, brand or device, adopted by him to distinguish and characterize said commodity as the product of his skilled labor, as the merchant or owner has to the exclusive use of his adopted trade-mark on his goods."

The question has engaged the attention of a number of the courts of this country, but the conclusions reached have not been uniform.

In Weener, &c., v. Brayton, 25 N. E. R., 46 (Mass., 1890), it was held that an injunction against the wrongful use of the label of the International Cigar Makers' Union should not be granted because of special injury to plaintiffs, who were officers and members of the union, but were not manufacturers of or dealers in the cigars on which such label is used, and to the same effect are the cases of Cigar Makers' Protective Union v. Conhaim, &c., 40 Minn., 243; McVey v. Brendel, 144 Pa. St. Rep., 235. However, a number of the

Hetterman Bros. & Co. v. Powers, etc.

courts have held otherwise.   In the case of Strasser v. Moon-
elis, 55 N. Y., Sup. Court, 197 (affirmed in Court of Appeals
1888), it was argued, as it is here, that the members of the
union were not the owners or manufacturers of cigars, but
merely laborers and that, therefore, the label did not come
within the settled definition of a trade-mark.   The court
said: "It is needless to discuss this phase of the case, for the
right to the exclusive use of this label may be sustained, al-
though it failed to be a trade-mark in the precise definition of
the term as heretofore used.   For whether we call the prop-
erty right, which I believe plaintiffs have in the label, a trade-
mark, or by another name, is a matter of slight import.   It
is a right entitled to the protection of a court of equity, on
the same principle as that upon which the courts have based
the right to protect trade-marks and good will.   It has been
accepted as the rule that the court proceeds upon the ground
that a person has a valuable interest in the good will of his
trade or business, and that, having appropriated to himself
a particular label or sign or trade-mark, indicating, to those
who wish to give him their patronage, that the article is
manufactured or sold by him, * * * he is entitled to protec-
tion against any other person who attempts to pirate on the
good will of his friends or customers * * * by sailing under
his flag, without his authority or his consent."

In Kohn v. People, 149 Ill., 486, the court upheld the con-
stitutionality of the Trades Union Act in that State, and as
the court, independent of the statute, disposed of one of the
contentions of counsel in the case, which is also relied on
here, we quote in part its argument: "It is next objected that
the label, an imitation and counterfeit of which is alleged

to have been unlawfully used by plaintiff in error, could not have been rightfully adopted either as a trade-mark or form of advertisement, it is said that it transgresses the rules of morality and public policy. We are referred to the rule in respect to trade-marks that 'to be a lawful trade-mark the emblem must avoid transgressing the rules of morality and public policy.' (Brown on Trade-marks, section 602.) * * *.

"By reference to the label heretofore set out it will be seen that it is a certificate, signed by the president of the Cigar Makers' International Union of America, certifying that the cigars contained in the box upon which it was placed were 'made by a first-class workman, a member of the Cigar Makers' International Union of America, an organization opposed to inferior, rat shop, coolie, prison or filthy tene- ment-house workmanship.' And it concludes: 'Therefore, we recommend these cigars to all smokers throughout the world.' The purpose, as derived from the label itself, is to send the cigars out to the public with the assurance that they are made by a first-class workman, who belongs to an order opposed to the inferior workmanship designated. It will be observed that the label attacks no other manufacturer of cigars. It says simply, in effect, these cigars are not the product of an inferior, rat shop, coolie, prison or filthy tene- ment-house workmanship. Can it be said that one may not, without condemning or aspersing the product of other manu- facturers, commend the article he has for sale? If he may do so himself, may he not procure the certificate of others as to the quality of the article he puts upon the market." (State v. Hagin, 6 Ind., Appeal, 109; Carson v. Ury, 39 Fed. Rep., 77.)

Further, we agree with the learned chancellor that there is no competent evidence that the appellees, or any of them, have been engaged in boycotting the appellants, and thus deprived themselves of the right to enforce their legal remedies in a court of equity. Whatever may be said of the letters and circulars looking to this end, and exhibited in the proof, it is not shown by any competent proof that the appellees instigated or had aught to do with the attempted boycott. And, moreover, this boycott, which seems to have occurred in 1886, did not in any way grow out of the wrongful use of the label in controversy. On the whole case, therefore, we are of opinion that the law may be justly invoked by organized labor to protect from piracy and intrusion the fruits of its skill and handiwork, and that brain and muscle may be the subjects of trade law rules as well as tangible property.

The judgment is affirmed.