RENDERED: NOVEMBER 15, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000097-TG
AND
2018-SC-000098-TG
(2018-CA-000289-MR)

FRED ZUCKERMAN, AS REPRESENTATIVE          APPELLANTS
OF THE GENERAL DRIVERS,
WAREHOUSEMEN AND HELPERS LOCAL
UNION NO. 89, ET AL.


V.          ON APPEAL FROM FRANKLIN CIRCUIT COURT
            HONORABLE THOMAS D. WINGATE
            FRANKLIN CIRCUIT COURT NO. 17-CI-000574


MATTHEW G. BEVIN, IN HIS OFFICIAL          APPELLEES
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY, ET AL.


## OPINION OF THE COURT BY JUSTICE VANMETER

### AFFIRMING

Under Section 14(b) of the Taft–Hartley Act, 29 U.S.C.[1] § 164(b),

Congress authorized states to enact right-to-work laws, *i.e.*, laws that prohibit

union shop agreements and agency shop agreements. In 2017, Kentucky's

---

[1] United States Code.

1

legislature passed, and the Governor signed, 2017 HB[2] 1, commonly referred to as the Kentucky Right to Work Act, 2017 Ky. Acts ch. 1, § 15 (the "Act"). Significantly, this Act amended KRS[3] 336.130(3) to provide that no employee is required to become, or remain, a member of a labor organization, or to pay dues, fees, or assessments to a labor organization. The Act's stated goal was "to attract new business and investment into the Commonwealth as soon as possible." 2017 Ky. Acts ch. 1, § 14. The issue we must decide in this case is whether the Franklin Circuit Court erred in dismissing constitutional challenges to the validity of the Act, specifically that it violated the Kentucky Constitution's provisions requiring equal protection of the laws, prohibiting special legislation, prohibiting takings without compensation, and that it was improperly designated as emergency legislation. We hold that the trial court did not err and therefore affirm the Franklin Circuit Court's Order dismissing the challenges to the Act.

## I.      Factual Background.

Bills virtually identical to 2017 HB 1 were introduced in almost every session of the legislature beginning in 2000[4] but never passed. Governor Bevin, as a candidate in 2015, actively campaigned on a platform of "right to work." Matt Bevin for Governor, https://www.mattbevin.com/issues (last

---

[2] House Bill.

[3] Kentucky Revised Statutes.

[4] 2000 HB 12; 2003 Senate Bill ("SB") 77; 2004 HB 173; 2005 SB 205; 2006 HB 38; 2007 HB 328; 2009 SB 165; 2011 HB 345; 2013 HB 308; 2014 HB 496; 2015 SB 1; 2016 SB 3. Legislative Research Commission, http://www.lrc.ky.gov/ (last visited Aug. 30, 2018). Our research uncovered no version of the bill in the biennial sessions 1986 through 1998.

visited Aug. 30, 2018). Following his election, he encouraged the electorate in 2016 to support legislative candidates who similarly favored "right to work." When the membership and leadership of the House changed with the 2016 election, the new majority's top priorities were the passage of a number of bills, including 2017 HB 1.

The House Economic Development and Workforce Investment Committee convened a hearing on HB 1 on January 4, 2017. At the hearing, proponents of the Bill testified in support of the Bill.[5] Their testimony included statistics that right-to-work states experience superior economic development and superior employment growth in both union and non-union jobs, specifically referring to Michigan, Indiana, and Tennessee. They cited Kentucky's disadvantage in attracting certain new employers to locate in the state due to the Commonwealth's status as a non-right-to-work state. In addition, Speaker Jeff Hoover referred to a study by Dr. Jeffrey Eisenach that concluded right-to-work greatly benefited job creation, specifically "[p]rivate sector employment grew by 17.4 percent in right-to-work states between 2001 and 2013."[6] Mr.

---

[5] The House Committee hearing was accessible on KET (Part 1: https://www.ket.org/legislature/?archive&program=WGAOS&nola=WGAOS+018003&part=1& epoch=2017; Part 2: https://www.ket.org/legislature/?archive&program =WGAOS&nola=WGAOS+018003&part=2&epoch=2017) (last visited Aug. 30, 2018). Witnesses in favor of the Bill were Governor Bevin, Speaker of the House Jeff Hoover, Majority Whip Jonathan Shell, David Adkisson, President & CEO of the Kentucky Chamber of Commerce, Kevin Grove, an executive with CBRE, a commercial real estate firm in Louisville, and Julia Crigler, state director for Americans For Prosperity, Kentucky chapter. Witnesses opposing the Bill were Anna Baumann, policy analyst for the Kentucky Center of Economic Policy, whose affidavit was attached to Appellants' brief in this Court, and Bill Londrigan, one of the plaintiffs/appellants herein.

[6] This quotation recited in the hearing appears to come from Jeffrey A. Eisenach, *Right-to-Work Laws: The Economic Evidence*, NERA Economic Consulting, http://www.nera.com/content/ dam/nera/publications/2015/PUB_Right_to_Work_Laws_0615.pdf (last visited Sep. 21, 2018).

David Adkisson referred to an LSU[7] study which reported that one-third of businesses looking to expand or relocate indicated that right-to-work was important. Mr. Kevin Grove spoke to his experience in attracting industrial development to the Louisville metropolitan area, and the advantage accruing to across-the-river Indiana due to that state's enactment of right-to-work legislation in 2012. The witnesses opposing the Bill, Ms. Anna Baumann and Mr. Bill Londrigan, provided testimony to refute the statistics and claims of the proponents. Much of this testimony is contained in Appellants' brief in this Court and accompanying attachments. 2017 HB 1 was quickly passed, largely on a partisan basis, and signed into law on an emergency basis.[8]

In May 2017, Fred Zuckerman, *et al.*,[9] filed an action in Franklin Circuit Court against the Commonwealth[10] challenging the Act on several Kentucky constitutional grounds. Thereafter, Barry Bright, Jacob Purvis and William Purvis filed a motion, which the trial court granted, to intervene as defendants on the side of the Commonwealth.

---

The quoted private sector employment growth rate, 17.4%, in right-to-work states compared with the comparable rate, 8.2%, in non-right-to-work states.

[7] Louisiana State University.

[8] Except for the Act's designation as emergency legislation, purportedly in violation of KY. CONST. § 55, no claim is made that the Act's passage and enactment did not comport with the requirements of the Constitution for a valid law.

[9] The plaintiffs/appellants are Fred Zuckerman and William Londrigan, as representatives respectively of the General Drivers, Warehousemen and Helpers Local Union No. 89 and the Kentucky State AFL-CIO, Affiliated Unions and their Members (collectively "the Unions").

[10] The defendants/appellees are Office of the Governor, *ex. rel.* Matthew G. Bevin, in his official capacity as Governor, and the Commonwealth of Kentucky, Kentucky Labor Cabinet, *ex rel.* Derrick K. Ramsey, in his official capacity as Secretary of the Kentucky Labor Cabinet (collectively "the Commonwealth").

In June 2017, the Commonwealth filed a motion to dismiss. The Unions subsequently filed a motion for partial summary judgment. After a September 2017 hearing, the trial court issued its Order denying the Unions' motion and granting the Commonwealth's motion. The Unions appealed. Because this case involves significant and important constitutional issues of great and immediate public importance, we granted transfer of the case from the Court of Appeals. CR[11] 74.02.

## II.    Standard of Review.

This case involves a facial challenge to the constitutionality of the Act under the Kentucky Constitution. We recognize, of course, that all laws "contrary to this Constitution, shall be void." KY. CONST. § 26. "Our functions are to determine the constitutional validity and to declare the meaning of what the legislative department has done. We have no other concern." *Johnson v. Commonwealth ex rel. Meredith*, 291 Ky. 829, 833, 165 S.W.2d 820, 823 (1942). Furthermore, "an [a]ct should be held valid unless it clearly offends the limitations and prohibitions of the constitution. . . . [A]lways the burden is upon one who questions the validity of an Act to sustain his contentions." *Id.* at 833–34, 165 S.W.2d at 823. "In considering an attack on the constitutionality of legislation, this Court has continually resolved any doubt in favor of constitutionality rather than unconstitutionality." *Hallahan v. Mittlebeeler*, 373 S.W.2d 726, 727 (Ky. 1963) (citing *Reynolds Metal Co. v.*

---

[11] Kentucky Rules of Civil Procedure.

*Martin*, 269 Ky. 378, 381–82, 107 S.W.2d 251, 253 (1937)). We have also held

that "the propriety, wisdom and expediency of statutory enactments are

exclusively legislative matters." *Hallahan*, 373 S.W.2d at 727 (citing *Craig v.*

*O'Rear*, 199 Ky. 553, 557, 251 S.W. 828, 830 (1923)). Further,

> courts are not at liberty to declare a statute invalid because, in
> their judgment, it may be unnecessary, or opposed to the best
> interests of the state. . . . [A]n act will not be declared void on the
> ground that it is opposed to the spirit supposed to pervade the
> Constitution, or is against the nature and spirit of the government,
> or is contrary to the general principles of liberty, or the genius of a
> free people.

*Craig*, 199 Ky. at 557–58, 251 S.W. at 830 (citations omitted).

Since the issues involve questions of law, our review is *de novo*, and we

do not defer to conclusions of the trial court. *Adams v. Sietsema*, 533 S.W.3d

172, 177 (Ky. 2017).

### III. Labor-Management Background.

A detailed history of Labor-Management relations would unduly prolong

this opinion, but an overview is helpful to the analysis of the issues before us,

particularly because 1) the Unions base their challenges under the Kentucky

Constitution, in part, on "the letter and the spirit of the document,"[12] and 2)

---

[12] *E.g.*, Appellants' Brief at 11, Union *Amicae*'s Brief at 1–5, 7. We recognize the importance of labor unions in United States' history and that of Kentucky. We acknowledge that unions have played a significant role in providing a path for many working families to the middle class, for improving working conditions and pay, for general acceptance of the forty-hour work week, and for other benefits. In 1933, our predecessor court had recognized the important function of labor unions:

> the rights of economic self-preservation; of improving economic and social
> conditions; of agreement among men; of free speech and action; of pursuing
> one's safety and happiness; of striving to achieve legitimate ends and benefits by
> concert of action or collective bargaining; and the privilege of assembling
> together in a peaceable manner for the common good. Upon this side may be
> placed also the unconscionable sweatshops and lamentable conditions under

6

right-to-work laws are explicitly authorized under federal law. 29 U.S.C. § 164(b).

## A. Kentucky Labor Law History to 1890.

Trade or labor unions in Kentucky were initially formed in the more urbanized areas of Louisville, Northern Kentucky, *i.e.*, Covington and Newport, and in the coal fields of Eastern Kentucky. *See generally* John Hennan, *Toil, Trouble, Transformation: Workers and Unions in Modern Kentucky*, 113 REG. OF THE KY. HIST. SOC'Y 233, 236-37 (2015) (attributing this formation to the post-Civil War period, although some scholars believe union activity existed in antebellum Kentucky). The first reported Kentucky case we have found involving a trade organization was *Sayre v. Louisville Union Benevolent Ass'n*, 62 Ky. (1 Duv.) 143, 145–46 (1863), in which the court generally recognized the right of workingmen to combine for their own protection and to obtain such wages as they choose to demand, but also noted combinations that prejudice the public by unduly elevating or depressing wages, tolls, or prices of any merchantable commodity are indictable as conspiracies. Four years later, the court decided *Lee v. Louisville Pilot Benevolent & Relief Ass'n*, 65 Ky. (2 Bush) 254 (1867). In *Lee*, the court affirmed the right of the organization to charge

---

which employees are all but compelled to work—those things which challenge an enlightened, humane society to opposition.

*Music Hall Theatre v. Moving Picture Mach. Operators Local No. 165*, 249 Ky. 639, 642, 61 S.W.2d 283, 284–85 (1933).

The issues in this case, however, are not whether unions are beneficial organizations, but whether the legislature's passing of the Act violated any provision of the Kentucky Constitution as argued by the Unions and the Union *Amicae*.

and collect dues, since "[t]he presumed object of the tariff was uniformity of charges, harmony, efficiency, and fidelity, and not unjust monopoly, or the extortion of exorbitant fees." *Id.* at 255.

Surprisingly, in the period pre-dating the 1890-91 Kentucky Constitutional Convention, that is it. In that era, and although courts recognized workingmen's right to organize, they also recognized employers' rights to conduct business as they saw fit and, absent a contract, to hire and fire employees generally at will. Furthermore, statutory laws regulating labor contracts, maximum hours, minimum pay, and the like, were generally held unconstitutional as an infringement of the employer's and individual employee's right of contract. *See generally* F. J. Stimson, HANDBOOK TO THE LABOR LAW OF THE UNITED STATES (New York: Charles Scribner's Sons, 1896), 1-19. Perhaps the most famous, or infamous, case of this era is *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), *abrogated by West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937), which held that New York's law prohibiting bakery employees from working more than sixty hours in a week was unconstitutional.

Two cases which post-date the 1890 Constitutional Convention, but which indicate the state of Kentucky labor law in this era are *Hetterman v. Powers*, 102 Ky. 133, 143, 43 S.W. 180, 182 (1897) (holding that a union was entitled to equitable protection in the use of label or mark designating product of labor of the members), and *Underhill v. Murphy*, 117 Ky. 640, 643–45, 78

S.W. 482, 482–83 (1904) (upholding use of strike injunction to protect owner's business and to prevent violence toward and intimidation of his employees).

**B.    *1890 Constitutional Convention.***

Following the Civil War, special legislation was used as a means to encourage Kentucky's economic development. To say that these enactments got out-of-hand would be an understatement. Most scholars accept that Kentucky's 1890 Constitutional Convention was necessitated by excessive proliferation of special legislation for the benefit of individual persons and corporations, an unequal tax burden and mounting local public debts, a desire to exercise control over railroads and railroad rates, and the 1850 antebellum constitution's indefensible protections for slavery. *See generally* Thomas D. Clark, A HISTORY OF KENTUCKY (Ashland, Ky.: The Jesse Stuart Found., 1988), 419–28. This Court has on many occasions recognized the need to curtail special legislation as the primary reason for the 1891 Constitution. *See, e.g., Yeoman v. Commonwealth, Health Policy Bd.*, 983 S.W.2d 459, 466 (Ky. 1998) (citing Sheryl G. Snyder & Robert M. Ireland, *The Separation of Governmental Powers Under the Constitution of Kentucky: A Legal and Historical Analysis of L.R.C. v. Brown*, 73 Ky. L. J. 165 (1984–85)); *Tabler v. Wallace*, 704 S.W.2d 179, 183 (Ky. 1985) (stating "[c]oncern for limiting the powers of the legislature in general, and with cutting off special and local legislation in particular, was the primary motivating force behind enactment of the new Kentucky Constitution of 1891[]").

To illustrate the problem of special legislation, in its 1888 session, the legislature passed 1,403 local and private acts, which took up 3,146 pages in a three-volume set. 1888 ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY (Frankfort, KY: John D. Woods, 1888).[13] By contrast, it passed 128 public acts, comprising 217 pages. *Id.* In 1890, the legislative record was similarly skewed in favor of special or local legislation: 1,726 local or private acts, in 4,703 pages, as opposed to 174 public acts, comprising 174 pages. 1890 ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY (Frankfort, KY: E. Polk Johnson, 1890). In each of these sessions, local or special acts accounted for over 90% of the total legislation passed.

Some of the special legislation exempted railroads and other corporations from taxation and created monopolies, which were decried by a number of the delegates. *E.g.*, I 1890 KY. CONST. DEBATES (Frankfort, Ky.: E. Polk Johnson, 1890), 466 (Del. Knott comments). Another point of view was that this legislation had encouraged economic development, expansion of railroads, and development of the state's natural resources. *See* Clark, A HISTORY OF KENTUCKY, 419–20 (describing editor Henry Watterson and his efforts to

---

[13] These numbers come from the table of contents of the Kentucky Acts' volumes. Interestingly, a number of the Public Acts had a decidedly local or restricted impact. *See, e.g.*, 1888 Ky. Acts ch. 632 (amending Ky. Gen. Stat. ch. 70, § 6 to increase from sixty days to six months the time period in which to file a mechanics' lien, but such amendment applied only to Madison County); 1888 Ky. Acts ch. 650 (exempting the Nicholasville, Danville and Lancaster Turnpike Company from the provisions of 1886 Ky. Acts ch. 1127 (requiring State's Sinking Fund Commissioners to approve the directors of a turnpike company in which the State of Kentucky owned stock)); 1888 Ky. Acts ch. 1347 (amending Ky. Gen. Stat. ch. 106, art. 2, § 3 (relating to taverns, tippling-houses, etc.), but such amendment applied only to Madison County).

promote industrial development).[14] This pro-development point of view was also reflected in the 1890 debates. *See* IV 1890 KY. CONST. DEBATES, 5014 (Del. Burham comments).[15]

We include these comments not to re-debate the issues of the late nineteenth century, but merely to point out that the framers of the 1891 Constitution were a varied assortment of men, representing different parts of the Commonwealth and economic interests. *See* Clark, 431 (stating "[t]his fourth convention was composed of as motley a delegation of constitutionalists as had ever been seen in a convention hall. . . . Farmer members opposed the sinister influence of corporations; and corporation lawyers, lobbyists and self-styled constitutionalists opposed [Farmers'] Alliance leadership[]"). Thus,

---

[14] To quote Dr. Clark:

> Henry Watterson and his "new departure" Democrats were diligent on the behalf of new industry. In Louisville, Watterson took the lead in pointing out new and profitable industrial opportunities. Boards of commerce distributed thousands of circulars at home and abroad describing Kentucky's resources and proclaiming Kentucky a land of unlimited business promise. Using the state's credit to encourage corporations was too unusual, however, for conservative agrarian legislators, and enthusiastic "new departure" partisans had to content themselves with granting generous tax exemption and special privileges. This encouragement to capital was soon noticeable, for railway mileage increased from 567 miles built and projected in 1860, to more than 1,500 miles in operation, in 1880. These roads represented a stated capital investment of $100,000,000. Along with the expansion of the Kentucky railway system, eastern capital poured into the state to develop timber and coal resources, and to build distilleries and tobacco warehouses.

Clark, A HISTORY OF KENTUCKY, at 420.

[15] Burnam stated:

> I would hold these corporations to their just responsibility for every infraction of private right or public law, but I shall never consent by my vote, in obedience to popular clamor, to strike down those great benefactors of the Commonwealth . . . . which are daily and hourly giving employment and to thousands of laborers, who have linked with bands of iron the different portions of the country, and strengthened and consolidated the power, the civilizations and true greatness of the human race.

11

selective quotations from a four-volume set of over 6,000 pages is not a useful exercise in "divining the intent of the framers." Our task, in the interpretation of Kentucky's Constitution,

> rests on the express language of the provision, and words must be given their plain and usual meaning. *City of Louisville Mun. Hous. Comm'n v. Pub. Hous. Admin.*, 261 S.W.2d 286, 287 (Ky. 1953). This Court is "not at liberty to construe . . . plain and definite language of the Constitution in such a manner as to thwart the deliberate purpose and intent of the framers of that instrument." *Harrod v. Hatcher*, 281 Ky. 712, 137 S.W.2d 405, 408 (1940). In fact, our predecessor Court recognized as a "cardinal rule" of constitutional interpretation the principle that rules of construction may not be employed where the language of the provision is clear and unambiguous. *Grantz v. Grauman*, 302 S.W.2d 364, 366 (Ky. 1957). "It is to be presumed that in framing the constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication[.]" *City of Louisville v. German*, 286 Ky. 477, 150 S.W.2d 931, 935 (1940).

*Fletcher v. Graham*, 192 S.W.3d 350, 358 (Ky. 2006).

To demonstrate the point that the 1891 Constitution does not reflect a "pro-labor, populist, progressive" point of view, as argued by the Unions and the Union *Amicae*, the Convention adopted only three explicitly pro-labor provisions. These sections were Section 243 relating to the minimum age of child labor, Section 244 requiring all wage earners to be paid in lawful money, and Section 253 restricting the labor of penitentiary labor to public works.[16] Other explicitly pro-labor proposals, such as those advocated by the Louisville Trades and Labor Assembly, Unions and Lodges, were not adopted— rejected

---

[16] Prior to 1891, neither the constitution nor statutes limited where convict labor could be employed. Employers therefore could lease convict labor to lower wages or to take the place of free, striking workers. *See* Henry C. Mayer, *Glimpses of Union Activity among Coal Miners in Nineteenth-Century Eastern Kentucky*, 86 REG. OF THE KY. HIST. SOC'Y 216, 220 (1988).

12

either in committee or by the Convention: designation of the number of hours that constitute a day's work on public projects; establishment of a Board of Arbitration "with full power to settle all industrial difficulties between employer and employee[;]" and designation of goods and wares manufactured by convict labor. I 1890 KY. CONST. DEBATES, 240 (Trades and Labor Assembly, Unions and Lodges, in the City of Louisville Petition). In addition, the Convention rejected an amendment to Section 243 which would have authorized the legislature to "provide by law for the proper ventilation of mines, the construction of escapements, shafts and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein." I 1890 KY. CONST. DEBATES, 265 (Del. Ramsey Resolution). Equal rights for women, another progressive reform which had been advocated by the Knights of Labor, then a national labor organization with a number of Kentucky locals, were similarly not espoused by the Convention. *See* II 1890 KY. CONST. DEBATES, 2371–72 (vote tabling provision to grant married women equal property rights). A provision to authorize women's suffrage, likewise, was not adopted in the final document.[17]

---

[17] Laura Clay, leader of the women's suffrage in Kentucky and daughter of Cassius Marcellus Clay, the "Lion of White Hall," was permitted to address the Convention. Her plea was not for recognition of women's suffrage as a constitutional right, but merely for a provision authorizing the legislature to enact women's suffrage "when the time shall come." II 1890 KY. CONST. DEBATES 2090-93. This limited provision was not included in the drafted Constitution; Section 145 limited suffrage to "[e]very male citizen . . . of the age of twenty-one." In 1912, the legislature authorized women to vote in elections for county school superintendents, as authorized by KY. CONST. § 155. *Crook v. Bartlett*, 155 Ky. 305, 159 S.W. 826 (1913).

The Convention adopted specific sections directed at corporations and railroads. KY. CONST. §§ 190-218. These provisions, however, ran to the benefit of the public at large, and were designed to correct the abuses which had occurred as a result of special legislation. *See, e.g.*, § 194 (requiring all corporations organized or carrying on business in the state to have a place of business and a registered agent); § 197 (prohibiting common carriers from issuing free passes to public officials); § 212 (subjecting railroad rolling stock and personal property to execution and attachment); §§ 213-15, 217-18 (requiring railroads not to discriminate or to give preferential treatment or rates). Similarly, and as to taxation, several provisions addressed special legislation abuses. *E.g.*, § 174 (subjecting corporate and individually owned property to uniform tax rates); §§ 177, 179 (prohibiting Commonwealth, counties or municipalities from becoming shareholders in corporations).

After the publication of the proposed Constitution in April 1891, the reaction of labor groups was mixed. Herbert Finch, Organized Labor in Louisville, Kentucky, 1880-1914 (1965) (unpublished Ph.D. dissertation, Univ. of Kentucky) (on file with the William T. Young Library, Univ. of Kentucky), 206–07. The Trades and Labor Assembly in Louisville "decided almost unanimously to vote against" the new Constitution. *Against the New*, THE COURIER-JOURNAL (Louisville), Mon., Jun. 15, 1891, p. 5, col. 4, https://www.newspapers.com/image/32457788/ (visited Sep. 5, 2018). Conversely, the Knights of Labor did endorse it at its annual state convention in July 1891, "by a close vote." *Knights' Labor*, THE COURIER-JOURNAL

14

(Louisville), Wed., Jul. 29, 1891, p. 8, col. 2, https://www.newspapers.com/image/32461411/ (visited Sep. 5, 2018).

In the final analysis, Dr. Clark has been quoted,

> **[T]he 1890 convention created a static document to protect [Kentucky's] agrarian society from an emerging industrial order:** "One gets the impression . . . that many of the delegates were, in fact, little Red Riding Hoods trudging alone and frightened through the perplexing forest of constitutional law, hoping that the big bad wolves of industrial and progressive changes were mere figments of their badly agitated imagination, and that a rigid constitution with static provisions would serve to dispel these threatening wraiths."

William Green, *Constitutions*, THE KENTUCKY ENCYCLOPEDIA (Lexington: The Univ. Press of Kentucky, 1992), 225 (emphasis added). No doubt exists but that the 1890 Convention sought to rein in the reign of special legislation, *i.e*, elimination of special tax breaks for railroads, equalization of tax burden, elimination of implied powers. The resulting document was "[n]ot so much a fundamental rule of government as a piece of omnibus legislation." Clark, 432.

## C.  *Federal Labor Law.*

With the enactment of major labor laws between 1932 and 1935, Congressional policy towards labor unions transformed from one of indifference (at best) to one of encouragement. These laws were the Norris–LaGuardia Act, c. 90, § 4, 47 Stat. 70 (1932), now codified at 29 U.S.C. § 104 (prohibiting injunctions with respect to any labor dispute)[18] and the Wagner Act, Act of July 5, 1935, 49 Stat. 449, 29 U.S.C. § 151 *et seq.* (also known as the National

---

[18] Section 2 of the Norris-LaGuardia Act contains a broad declaration of public policy and of the need to protect workers in joining unions, pursuing collective bargaining and resorting to concerted activities. 29 U.S.C. § 102.

15

Labor Relations Act ("NLRA")).[19] Following World War II, Congress modified the Wagner Act by the Taft–Hartley Act (also known as the Labor Management Act, 1947), c. 120, § 1, 61 Stat. 136, 29 U.S.C. § 141 *et. seq.*

By enacting these laws, "Congress largely displaced state regulation of industrial relations," and thus, states "may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 1061, 89 L. Ed. 2d 223 (1986) (citing *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959)). Section 14(b) of the Taft–Hartley Act, however, provides a limited exception:

> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b).

The historical context of the relevant aspects of the Taft–Hartley Act is instructive. *See Commc'ns Workers v. Beck*, 487 U.S. 735, 747, 108 S. Ct. 2641, 2650, 101 L. Ed. 2d 634 (1988) ("[T]he structure and purpose of § 8(a)(3) are best understood in light of the statute's historical origins."). Prior to the

---

[19] An earlier law, the National Industrial Recovery Act ("NIRA"), c. 90, 48 Stat. 195, 196 (1933); 15 U.S.C. § 703, also contained provisions encouraging unionization. The basic statute, however, was declared unconstitutional. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S. Ct. 837, 79 L. Ed. 1570 (1935). Unlike the NIRA, the Wagner Act's constitutionality was upheld. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S. Ct. 615, 81 L. Ed. 893 (1937).

Taft–Hartley Act, section 8(a)(3) of the NLRA permitted closed shop, union shop, and agency shop agreements. *Oil, Chem. & Atomic Workers, Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 414, 96 S. Ct. 2140, 2144, 48 L. Ed. 2d 736 (1976). As typically understood, a closed shop is a type of union-security agreement that requires prospective employees to become union members before commencing employment. *Id.* at 409 n.1, 96 S. Ct. at 2141 n.1. By contrast, a union shop, which requires employees to join the union after being hired, and an agency shop, which requires employees to make payments to the union after being hired but not to join the union, are less stringent types of union-security agreements. *See id.* "By 1947, [closed shops] had come under increasing attack," and Congress determined that they should be banned. *Beck*, 487 U.S. at 748, 108 S. Ct. at 2650. Congress also recognized that prohibiting closed shops could create a free rider problem, *i.e.*, employees choosing not to contribute financially to the union but still benefiting from the union's actions. *See id.*

Against this historical backdrop, section 8(a)(3) of the Taft–Hartley Act attempted to accomplish the "twin purposes" of eliminating "the most serious abuses of compulsory unionism . . . by abolishing the closed shop" but still allowing certain union-security agreements to counter the free rider problem. *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 740–41, 83 S. Ct. 1453, 1458, 10 L. Ed. 2d 670 (1963). Specifically, section 8(a)(3) "makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor

17

organization.'" *Beck*, 487 U.S. at 744, 108 S. Ct. at 2648 (quoting 29 U.S.C. § 158(a)(3)). "Taken as a whole, § 8(a)(3) permits an employer and union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core.'" *Beck*, 487 U.S. at 745, 108 S. Ct. at 2648 (footnote omitted) (quoting *Gen. Motors*, 373 U.S. at 742, 83 S. Ct. at 1459).

"While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, **§ 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy.**" *Mobil Oil*, 426 U.S. at 416–17, 96 S. Ct. at 2145 (emphasis added). Specifically, § 14(b) "allows a State or Territory to ban agreements requiring membership in a labor organization as a condition of employment. *Id.* at 417, 96 S. Ct. at 2145 (quotation and footnote omitted). As explained by the Court, § 14(b) "was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. And it was the proviso to § 8(a)(3), expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746, 751, 83 S. Ct. 1461, 1464, 10 L. Ed. 2d 678 (1963) (footnote omitted); *see also Laborers' Int'l Union, Local No. 107 v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973) (Section 14(b) "can best be

18

described as an exception to the general rule that the federal government has preempted the field of labor relations regulation.").

With that background, we turn to the claims in this case.

## IV.    Analysis.

As previously noted, the Unions raise four constitutional challenges to the Act: (a) violation of Kentucky's equal protection of the laws provisions; (b) violation of Kentucky's prohibition on special legislation; (c) violation of Kentucky's prohibition of takings without compensation; and (d) improper designation as emergency legislation. We address each claim in turn.

### A.    *Equal Protection.*

Citizens of Kentucky enjoy equal protection of the law under the 14th Amendment of the United States Constitution and Sections 1, 2, and 3 of the Kentucky Constitution. *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003) (citation omitted).[20] Sections 1, 2, and 3 of the Kentucky Constitution provide that the legislature does not have arbitrary power and shall treat all persons equally. "[U]nless a statutory classification is arbitrary, or not founded on any substantial distinction suggesting the necessity or propriety of such legislation, the courts have no right to interfere with the exercise of legislative discretion. *Ky. Ass'n of Chiropractors, Inc. v. Jefferson Cnty. Med. Soc'y*, 549 S.W.2d 817,

---

[20] The Unions make no claim under the 14th Amendment. That provision requires persons who are similarly situated to be treated alike. Federal courts have held that right-to-work laws do not violate any provision of the United States Constitution. *Lincoln Fed. Labor Union No. 19129, A.F. of L. v. N.w. Iron & Metal Co.*, 335 U.S. 525, 69 S. Ct. 251, 93 L. Ed. 212 (1949); *Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538, 69 S. Ct. 258, 93 L. Ed. 222 (1949); *see, e.g., Sweeney v. Daniels*, No. 2:12CV81–PPS/PRC, 2013 WL 2090473 at *8 (N.D. Ind. 2013), *aff'd sub nom. Sweeney v. Pence*, 767 F.3d 654 (7th Cir. 2014).

19

822 (Ky. 1977). As noted earlier, our analysis begins with the presumption that legislative acts are constitutional. *United Dry Forces v. Lewis*, 619 S.W.2d 489, 493 (Ky. 1981); *Sims v. Bd. of Educ.*, 290 S.W.2d 491, 493 (Ky. 1956); *Brooks v. Island Creek Coal Co.*, 678 S.W.2d 791, 792 (Ky. App.1984). The goal of equal protection provisions is to "keep[] governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1 (1992). However, because nearly all legislation differentiates in some manner between different classes of persons, neither the federal nor state constitutions forbid such classification per se. *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996). Accordingly, the level of judicial scrutiny applied to an equal protection challenge depends on the classification made in the statute and the interest affected by it. *See Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 253, 94 S. Ct. 1076, 1080, 39 L. Ed. 2d 306 (1974).

Currently, three levels of review may apply to an equal protection challenge. *See, e.g., Steven Lee Enters. v. Varney*, 36 S.W.3d 391, 394–95 (Ky. 2000). Strict scrutiny applies whenever a statute makes a classification based on a "suspect" class. *See Codell*, 127 S.W.3d at 575–76 (discussing strict scrutiny). In *Varney*, for example, we noted race, alienage, and ancestry as suspect classes. 36 S.W.3d at 394. In such cases, or when a statute affects a fundamental right, a statute is "sustainable only if [it] is suitably tailored to serve a 'compelling state interest.'" *Id.* (citation omitted). The next level of analysis, heightened rational basis scrutiny, applies to quasi-suspect classes,

such as gender or illegitimacy. *Id.* Under this standard, "discriminatory laws survive equal protection analysis only 'to the extent they are substantially related to a legitimate state interest.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441, 105 S. Ct. 3249, 3255, 87 L. ed. 2d 313 (1985)). On the other hand, a statute that "merely affects social or economic policy . . . is subject" to a less searching form of judicial scrutiny, *i.e.* the "rational basis" test. *Codell*, 127 S.W.3d at 575 (citation omitted).

Rational basis review is appropriate for evaluating the Act since the Act is expressly permitted by the Taft–Hartley Act § 14(b). The Supreme Court long ago held that, under federal law, union membership is not a suspect classification triggering strict scrutiny. *City of Charlotte v. Local 660, Int'l Ass'n of Firefighters*, 426 U.S. 283, 286, 96 S. Ct. 2036, 2038, 48 L. Ed. 2d 636 (1976). The result is the same under Kentucky case law, which recognizes that statutes relating to labor and labor organizations are proper objectives for exercise of the Commonwealth's police power. *Hamilton v. Int'l Union of Operating Eng'rs*, 262 S.W.2d 695, 700 (Ky. 1953); *see also Ky. Harlan Coal Co. v. Holmes*, 872 S.W.2d 446, 451 (Ky. 1994), *abrogated on other grounds by Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455 (Ky. 2011) (stating "the Commonwealth's power to legislate public policy in the area of employer/employee relations derives from its police power[]"); *Commonwealth v. Reinecke Coal Min. Co.*, 117 Ky. 885, 894, 79 S.W. 287, 289–90 (1904) (statute relating to timely payment of coal miners and forbidding blacklisting of employees was valid exercise of police power). Furthermore, "[t]he essential

21

predicate of the police power is the health, morals, safety, and general welfare of the people." *Jones v. Russell*, 224 Ky. 390, 392, 6 S.W.2d 460, 461 (1928). The legislature "in making police regulations has the right to make classifications based upon natural and reasonable distinctions, but is without right to exercise the power to classify arbitrarily and without any reasonable basis inherent in the objects of the classification." *Id.* at 393, 6 S.W.2d at 461. A statute complies with Kentucky equal protection requirements if a "rational basis" supports the classifications that it creates. *Elk Horn Coal Corp. v. Cheyenne Res., Inc.*, 163 S.W.3d 408, 418–19 (Ky. 2005) (citation omitted); *Waggoner v. Waggoner*, 846 S.W.2d 704, 707 (Ky. 1992) (citation omitted).

In *Varney*, we quoted at length from *Heller v. Doe by Doe*, 509 U.S. 312, 319-21, 113 S. Ct. 2637, 2642-43, 125 L. Ed. 2d 257 (1993), as "[t]he best summary of what rational basis analysis entails and what it does not entail[:]"

> We many times have said, and but weeks ago repeated, that rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

22

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations— illogical, it may be, and unscientific.

*Varney,* 36 S.W.3d at 395 (internal quotations and ellipses omitted).

In *Elk Horn Coal,* we explained that the statute under consideration, KRS 26A.300, did not treat all unsuccessful appellants the same, and thus was "discriminatory. But the state may discriminate in certain matters if there is a rational basis for such discrimination." 163 S.W.3d at 413. As previously noted, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if . . . any reasonably conceivable state of facts . . . could provide a rational basis for the classification." *Id.* (quotation and footnote omitted);[21] *see also Popplewell's*

---

[21] In *Elk Horn Coal,* we acknowledged that, on occasion based on particular facts, we had elected to apply a higher level of scrutiny to equal protection analysis in cases involving social and economic legislation. 163 S.W.3d at 418 nn. 43-44 (citing *Tabler,* 704 S.W.2d at 186-87 as requiring substantial and justifiable reason for discriminatory legislation). A cursory reading of *Tabler,* however, discloses that the decision addressed the prohibition of special legislation in sections 59 and 60 of the Kentucky Constitution, specifically section 59(5) regulating limitation of civil causes. In *Elk Horn Coal,* we declined to address this "heightened" standard because of our view that the legislation in question failed even the rational basis test as "arbitrary and irrational." 163 S.W.3d at 421.

*Alligator Dock No. 1, Inc. v. Revenue Cabinet*, 133 S.W.3d 456, 466-67 (Ky. 2004) (upholding sales and use tax exemption for gasoline sales for industrial-type commercial vessels); *Commonwealth v. Howard*, 969 S.W.2d 700, 703-04 (Ky. 1998) (upholding juvenile DUI statute which imposes lower blood alcohol level for drivers under 21 years of age).

In *Delta Air Lines, Inc. v. Commonwealth, Revenue Cabinet*, in upholding a sales and use tax classification, we held:

> The standards for classifications under the Kentucky constitution are the same as those under the Fourteenth Amendment to the Federal constitution. A single standard can be applied to both the State and Federal constitutions in regard to classification for sales tax exemptions. This Court has determined that economic factors are valid considerations which the legislature may take into account in developing a legitimate tax classification. The legislature has a great freedom of classification and the presumption of validity can be overcome only by the most explicit demonstration that it is hostile and oppressive against particular persons and classes.

689 S.W.2d 14, 18 (Ky. 1985) (citations omitted). "A classification by the legislature should be affirmed unless it is positively shown that the classification is so arbitrary and capricious as to be hostile, oppressive and utterly devoid of rational basis." *Id.* at 19.

The Unions and the Union *Amicae* strenuously argue that the Act creates a classification which has no substantial or justifiable basis. They claim right-to-work policies reduce wages for union and non-unions employees, have mixed impact on employment outcomes, and have no statistically significant impact on overall state employment. They argue the true motivation is "to starve labor organizations and their members based on perceived political

24

bent." The Commonwealth, conversely, argues that the legislature reasonably could conclude that the Act would, as testified by the proponents of 2017 HB 1, benefit Kentucky and its citizens by joining other right-to-work states with superior economic development, employment growth in both union and non-union jobs, and eliminate Kentucky's disadvantage with respect to its neighboring right-to-work states in competing to attract new businesses. The Commonwealth further argues that the legislature might have sought to provide economic freedom for workers who desired not to support any union activities.

The legislature is permitted to set the economic policy for the Commonwealth. Even assuming that the Act creates a classification that discriminates between labor unions and all other organizations operating in the state,[22] or any sort of classification among union and non-union workers, we

---

[22] We reject the Unions' analogy that labor unions are akin to the Kentucky Bar Association ("KBA") for purposes of the Act. Historically, labor unions, as opposed to trade or craft unions, arose as associations of workers/employees to improve pay and working conditions and to provide a unified group to assert rights against their employer. *See Music Hall Theatre*, 249 Ky. at 642, 61 S.W.2d at 284–85. These same functions are largely served today through an overlay of federal law and collective bargaining agreements. Unions are voluntary organizations, even in non-right-to-work states. The KBA, by contrast, exists by virtue of the state constitution. *See* KY. CONST. § 116 (requiring the Kentucky Supreme Court to "by rule, govern admission to the bar and the discipline of members of the bar[]"). The KBA's purpose is

> to maintain a proper discipline of the members of the bar in accordance with these rules and with the principles of the legal profession as a public calling, to initiate and supervise, with the approval of the court, appropriate means to insure a continuing high standard of professional competence on the part of the members of the bar, and to bear a substantial and continuing responsibility for promoting the efficiency and improvement of the judicial system.

Kentucky Rules of the Supreme Court ("SCR") 3.025. The KBA is not a voluntary association, SCR 3.030(1), except in the sense that no one is required to practice law in Kentucky. The essential tenor of SCR 3.025 is that the KBA exists for the protection of the public: "proper discipline . . . of the bar," "high standard of professional competence" and "efficiency and improvement of the judicial system[.]"

25

are unable to say that the legislature did not have a reasonable basis for so doing. As stated in *Varney,* "[a] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." 36 S.W.3d at 395. The legislature clearly established a rational basis for the Act: to promote economic development, to promote job growth, and to remove Kentucky's economic disadvantages in competing with neighboring states. Additionally, and even though not required, the proponents of the Act tendered empirical evidence to support the claimed benefits.

One does not need an advanced degree in labor economics to recognize that employers might be attracted to locate in a state where wages are lower as opposed to a state where wages are higher. To the extent this conclusion might be characterized as speculative, it is undoubtedly rational. The legislature can clearly make a policy decision that the Act might result in more jobs, albeit at lower wages, and that this result, in turn, might benefit the overall economic climate of Kentucky. In fact, this result is supported by some of the economic studies noted by the Unions. *See* Robert Bruno, Affidavit at 5 (stating that some studies suggest right to work laws increase manufacturing employment, while other studies find no effect). All the while, of course, for any given workplace, the majority of workers retain the federally-protected right to organize.

The Act does not violate the equal protection provisions of the Kentucky Constitution. We are unable to say the legislature's "classification is so

arbitrary and capricious as to be hostile, oppressive and utterly devoid of rational basis." *Delta Airlines*, 689 S.W.2d at 19. To the extent the Unions claim they will be prohibited from collecting a fee for legally-protected, legally authorized services, that claim is addressed, *infra*, in our discussion on *Taking for Public Purpose without Just Compensation.*

As to the Unions' claim that the Act impairs their freedom to contract, Kentucky law has long recognized that the police power, based on "the general welfare of the community," may validly infringe on the right to contract. *City of Covington v. Sanitation Dist. No. 1*, 301 S.W.2d 885, 888 (Ky. 1957). "The exercise of such a power must be reasonable and in conformity with the necessity of the case and have a substantial basis for the action." *Id.* at 889. Based on our previous discussion concerning the legislature's stated reasons for enacting the Act, we hold that its enactment satisfies this test.

### B.   Special Legislation.

The Unions claim the Act constitutes special legislation in violation of Sections 59 and 60 of the Kentucky Constitution. Specifically, Section 59 states: "[t]he General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: . . . Twenty-fourth: To regulate labor, trade, mining or manufacturing." The purpose of this section is not to prevent the legislature from enacting any laws concerning labor, trade, mining or manufacturing. That would be absurd.[23]

---

[23] If the meaning were to prohibit all laws addressing these subjects, then entire Titles of the Kentucky Revised Statutes would be void. *E.g.,* KRS Title XXVII: Labor and Human Rights; KRS Title XXVII: Mines and Minerals; KRS Title XXIX: Commerce and Trade. Examples of

27

Rather, the intent is for any acts touching these subjects be general acts. *See, e.g., Waggoner*, 846 S.W.2d at 706–07 (stating "[t]he fact that the [legislature] deals with a special subject does not *per se* make it special legislation[]"); *D.E. Hewitt Lumber Co. v. Brumfield*, 196 Ky. 723, 727, 245 S.W. 858, 860 (1922) (holding that § 59 "inhibitions apply only to local and special legislation, and therefore do not apply here unless the [Workers'] Compensation Act is either a local or a special act[]"). Furthermore, we note the purpose of these sections is to "prevent special privileges, favoritism, and discrimination, and to ensure equality under the law . . . [and to] prevent the enactment of laws that do not operate alike on all individuals and corporations." *Louisville/Jefferson Cnty. Metro Gov't v. O'Shea-Baxter, LLC*, 438 S.W.3d 379, 383 (Ky. 2014) (quotations and citations omitted).

Special legislation is defined as arbitrary and irrational legislation that favors the economic self-interest of the one or the few over that of the many. *Yeoman*, 983 S.W.2d at 468. "Local" or "special" legislation applies exclusively to special or particular places, or special and particular persons, and is distinguished from a statute intended to be general in its operation, and that relates to classes of persons or subjects. More specifically, "[a] 'local law' is one whose operation is confined within territorial limits other than those of the whole state, or any properly constituted class or locality therein." *Ravitz v.*

---

Chapters within these titles are KRS Chapter 341, Unemployment Compensation; KRS Chapter 350, Surface Coal Mining; and KRS Chapter 355, Uniform Commercial Code.

*Steurele*, 257 Ky. 108, 115, 77 S.W.2d 360, 364 (1934). Here, the Act is clearly

not a local act because its application is statewide.

In *Johnson v. Commonwealth ex rel. Meredith*, our predecessor court

noted a clear distinction between a general and a special law, stating "'[a]

statute which relates to persons or things *as a class* is a general law, while a

statute which relates to particular persons or things *of a class* is special.'" 291

Ky. at 837, 165 S.W.2d at 825 (quoting *State ex rel. v. Tolle*, 71 Mo. 645, 650

(1880)); *see also Ravitz*, 257 Ky. 108, 77 S.W.2d 360; *Stevenson v. Hardin*, 238

Ky. 600, 603, 38 S.W.2d 462, 463–64 (1931) (law excepting party nominations

from mandatory primary held to be general law as applying to all statewide

officers— "general in its application and applies in an equal manner to all

persons similarly situated"). In *Johnson*, the issue concerned the authorization

of all executive departments of the state to employ a certain class of

professional assistants. The court opined that it "can conceive nothing more

foreign to special legislation" than this statute. 291 Ky. at 837, 165 S.W.2d at

825.

Our case law has long recognized a simple, two-part test for determining

whether a law constitutes general legislation in its constitutional sense: (1)

equal application to all in a class, and (2) distinctive and natural reasons

inducing and supporting the classification. *Yeoman*, 983 S.W.2d at 466;

*Waggoner*, 846 S.W.2d at 707; *Schoo v. Rose*, 270 S.W.2d 940 (Ky. 1954);

*Droege v. McInerney*, 120 Ky. 796, 87 S.W. 1085 (1905); *Safety Bldg. & Loan

Co. v. Ecklar*, 106 Ky. 115, 50 S.W. 50 (1899); *see also Burrow v. Kapfhammer*,

284 Ky. 753, 761–62, 145 S.W.2d 1067, 1072 (1940) (holding unconstitutional hour and wages law which applied to restaurants employing waiters, but not to hotel dining room waiters).

Frankly, the Act applies to all collective bargaining agreements entered into on or after January 9, 2017, with the exception of certain employees covered or exempted by federal law. KRS 336.132. With the exceptions required by federal law, it applies to all employers and all employees, both public and private. It does not single out any particular union, industry or employer. It applies statewide. We have previously rejected constitutional challenges to legislation that purportedly promoted or harmed organized labor as claimed special legislation, so long as a rational basis existed for the statute. *See Hamilton*, 262 S.W.2d at 700. And in *Waggoner*, we stated "[t]he responsibility of this Court is to draw all reasonable inferences and implications from the act as a whole and thereby sustain its validity." 846 S.W.2d at 707 (citing *Graham v. Mills*, 694 S.W.2d 698 (Ky. 1985)). In *Tabler*, we required that "a substantial and justifiable reason [must appear] from legislative history, from the statute's title, preamble or subject matter, or from some other authoritative source." 704 S.W.2d at 186. The legislature clearly established a rational basis for the Act: to promote economic development, to promote job growth, and to remove Kentucky's economic disadvantages in competing with neighboring states. As noted above, testimony supporting the legislation was presented at House committee hearings in January 2017. The

30

Unions and Union *Amicae*, as noted, disagree, but we are unable to say that the legislature's rationale is unreasonable.[24]

## C. *Taking for Public Purpose without Just Compensation.*

Next, the Unions argue that the Act constitutes a public taking of labor union property without just compensation, in violation of Sections 13 and 242 of the Kentucky Constitution. Section 13 provides, in pertinent part, that no "man's property [shall] be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him." Section 242 provides:

> Municipal and other corporations, and individuals invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them; which compensation shall be paid before such taking, or paid or secured, at the election of such corporation or individual, before such injury or destruction.

The Unions' argument is two-fold. First, they assert that the Act takes union property because unions are required to provide valuable services to all employees in a bargaining unit irrespective of union membership without being compensated in return.[25] Second, they maintain the Act takes from unions

---

[24] The concurring in part/dissenting in part opinion seems to suggest that any time the legislature seeks to alter any policy yet grandfather pre-existing rights, duties or obligations, then the resulting legislation is constitutionally infirm under Sections 59 and 60. Such analysis ignores the longstanding case law cited in this opinion that establishes the two-part test for analyzing legislation under a special legislation challenge, and would severely hinder any legislative effort to effect change in socio-economic policy.

[25] A union's duty of fair representation arises from its statutory designation as the exclusive representative of the bargaining unit and has been established by case law. *See, e.g., Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 198–99, 65 S. Ct. 226, 230, 89 L. Ed. 173 (1944). However, under the duty of fair representation, a union retains broad discretion. In *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S. Ct. 1127, 1130, 113 L. Ed. 2d 51 (1991), the Court held that

31

without compensation their valuable contract right that all employees share in the cost of representation in future renewals of collective bargaining agreements. We address these arguments in turn.

1.    Providing required service without compensation.

The Unions rely on this court's decision in *Bradshaw v. Ball*, 487 S.W.2d 294 (Ky. 1972) (a case arising out of an attorney being required to represent an indigent criminal defendant) in support of their argument that a requirement to provide a valuable service without compensation constitutes an unconstitutional taking. The Unions analogize that the *Bradshaw* principle— no one can be required under the Kentucky Constitution to provide valuable services without compensation—applies to union services representing nonmembers, for such items as negotiating and administering contracts, handling employee grievances, including arbitration, arbitration fees, attorney fees, union representatives' salaries, hearing room costs, court reporters, and other associated expenses. Assuming, arguendo, that *Bradshaw* stands for that proposition, and no other,[26] the Supreme Court's analysis of the "free-rider

---

the rule announced in *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S. Ct. 903, 916, 17 L. Ed. 2d 842 (1967)—that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"—applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S. Ct. 681, 686, 97 L. Ed. 1048 (1953), as to be irrational.

[26] A careful reading of *Bradshaw* demonstrates that its holding must be considered in the historical and factual context in which it was decided. All Kentucky cases regarding attorneys' representation of indigent defendants prior to *Bradshaw* held that, as officers of the court, attorneys were expected to perform these services as a collateral function of the profession. *E.g., Slavens v. Commonwealth*, 481 S.W.2d 650 (Ky. 1972); *Jones v. Commonwealth*, 457 S.W.2d 627 (Ky. 1970); *Warner v. Commonwealth*, 400 S.W.2d 209 (Ky. 1966). However, as

problem" in its recent decision in *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, ___ U.S. ___*, 138 S. Ct. 2448 (2018)[27] conclusively refutes, for several reasons, the Unions' claim that they will be compelled to provide services without compensation.

The Court addressed the arguments advanced to justify non-members' payment of agency fees, specifically that because unions are required by law to represent the interests of all employees in the bargaining unit, whether union members or not, it is unfair that non-members, *i.e.*, free-riders, are not required to pay fees. The Court noted that unions in many states represent employees who do not pay agency fees. *Id.* at 2467. No union is compelled to seek designation as exclusive representative, but such designation is avidly

---

federal criminal procedural rights were being expanded by cases such as *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 733 (1963), this court became increasingly concerned that the time and knowledge required to represent indigent criminal defendants effectively was reaching a crisis point, stating "[b]ecause of the increased crime rate and the expansion by U.S. Supreme Court decisions of new federal constitutional standards to the administration of criminal justice in the state courts, an intolerable burden has been thrust particularly upon the younger members of the legal profession." *Bradshaw*, 487 S.W.2d at 297. Specifically, we noted that "attorneys cannot constitutionally be compelled to serve as counsel without compensation, in circumstances where the burden of such service will amount to a substantial deprivation of property." *Id.* at 298. However, an additional very significant constitutional right that permeates the opinion is the right of an accused to effective assistance of counsel. Two points are clear in *Bradshaw*. One, the court expressed concern over the continuing burden on young attorneys to shoulder the increasing financial burden of representing indigent criminal defendants. And two, the court questioned whether the existing system provided the constitutionally mandated right to counsel for an accused. Both rights are mentioned throughout the opinion.

[27] At oral argument, the Unions sought to distinguish *Janus* by virtue of the Court's addressing the First Amendment right asserted by a public employee. While we acknowledge that difference, we note the Illinois Public Labor Relations Act's legal requirements for public unions share many features of the NLRA. *See* 5 Ill. Comp. Stat. Ann. 315/6 (West 2016) (requiring vote in a bargaining union for union representation; exclusive representation of all employees by the union; exclusive union negotiation with the employer on matters relating to "pay, wages, hours and other conditions of employment," including policy matters; union duty to represent the interests of all employees).

33

sought.[28] *Id.* First, such designation provides a union with a privileged place over wages, benefits, and working conditions. In the collective bargaining process, the union has the exclusive right to speak for all employees and an employer is required to listen to the union and negotiate in good faith. The designation results in a tremendous increase in power of the union. *Id.* (citing *Am. Commc'n Ass'n v. Douds*, 339 U.S. 382, 401, 70 S. Ct. 674, 686, 94 L. Ed. 925 (1950)). Second, the union is granted special privileges in obtaining information about employees and having fees and dues deducted directly from wages. *Id.* As noted by the Court, these benefits greatly outweigh any extra burden imposed by the duty of fair representation for nonmembers, and the duty of fair representation does not significantly increase expenses that the unions would otherwise bear in negotiating collective bargaining agreements. *Id.* at 2467–68. Pertinently, and as to representation of nonmembers in grievance proceedings, the Court stated "[u]nions do not undertake this activity solely for the benefit of nonmembers[.]" *Id.* at 2468. A union sends a representative to the proceedings to further its

> interest in keeping control of the administration of the collective bargaining agreement, since the resolution of one employee's grievance can affect others. And when a union controls the grievance process, it may, as a practical matter, effectively

---

[28] Recent examples of union organizing efforts in right-to-work states have occurred in South Carolina and Tennessee. *See* Doug Cameron, *Boeing May Face Union Vote at 787 Plant*, WALL ST. J. (Jan. 20, 2017), https://www.wsj.com/articles/boeing-may-face-union-vote-at-787-plant-1484923731?mod=searchresults&page=1&pos=4 (visited Aug. 29, 2018) (article noting "long-running efforts to organize" by International Association of Machinists and Aerospace Workers); Christina Rogers, *UAW Plans Another Push at Volkswagen*, WALL ST. J. (Sept. 17, 2014), https://www.wsj.com/articles/uaw-sets-up-local-at-volkswagen-in-tennessee-1410975613?mod=searchresults&page=1&pos=2 (visited Aug. 29, 2018) (article noting "[a] foothold in Tennessee would represent a major advance after a long series of failed attempts to organize Southern factories operated by foreign auto makers[]").

subordinate the interest of [an] individual employee to the
collective interests of all employees in the bargaining unit.

*Id.* (quotations and citations omitted); *see also Vaca v. Sipes*, 386 U.S. 171,

190–94, 87 S. Ct. 903, 916–19, 17 L. Ed. 2d 841 (1967) (holding that individual

employee has no absolute right to have grievance taken to arbitration; breach

of duty of fair representation is sustained only by proof of "arbitrary or bad-

faith conduct on the part of the Union in processing [a] grievance[]").

Other courts have similarly held that unions are fully and adequately

compensated for any loss of fees from nonmembers through the exclusive

representation designation. *Sweeney v. Pence*, 767 F.3d 654, 666 (7th Cir.

2014) (upholding Indiana's right-to-work law against federal Fifth Amendment

takings claim); *Int'l Union of Operating Eng'rs Local 370 v. Wasden*, 217

F.Supp.3d 1209, 1223–24 (D. Idaho 2016) (upholding Idaho's right-to-work law

against federal Fifth Amendment takings claim); *Int'l Union of Operating Eng'rs

Local 139 v. Schimel*, 210 F.Supp.3d 1088, 1096–97 (E.D. Wis. 2016)

(upholding Wisconsin's right-to-work law against federal Fifth Amendment

takings claim), *aff'd* 863 F.3d 674 (7th Cir. 2017); *see also Zoeller v. Sweeney*,

19 N.E.3d 749, 753 (Ind. 2014) (upholding Indiana's right-to-work law against

state constitutional takings challenge on the basis that "[t]he Union's federal

obligation to represent all employees in a bargaining unit is optional; it occurs

only when the union elects to be the exclusive bargaining agent, for which it is

justly compensated by the right to bargain exclusively with the employer[]").

The foregoing analysis applies equally to private sector employees and

effectively distinguishes the present case from *Bradshaw.* A union's

representation of a nonmember employee through collective bargaining or grievance processing serves the union's interest, irrespective of whether it receives an agency fee. A union is not "compelled" by the Act to represent nonmembers without compensation. By contrast, the uncompensated attorney receives nothing for his or her time and effort. Because exclusive designation fully and adequately compensates unions for free-riders, the Act does not constitute a taking of private property without compensation, and therefore does not violate Sections 13 and 242 of the Kentucky Constitution.

2.      Taking of a Contract Right in Future Renewals.

The Unions do not spend too much time on this argument, presumably because the Act effectively carves out current contracts and will apply only to renewals of collective bargaining agreements. The Unions, however, argue that unions have negotiated for decades over union security clauses, have an expectation that these provisions will continue and that collective bargaining agreements are different from regular commercial contracts. We disagree.

Section 14(b) of the Taft-Hartley Act has been part of the NLRA since 1947. Congress has for 70 years expressly permitted states to enact right-to-work laws. Right-to-work legislation has been proposed in Kentucky for almost 20 years. We fail to perceive that any expectation in the continuation of a union security clause could be a reasonable expectation. *See Morrisey v. West Virginia AFL-CIO*, 804 S.E.2d 883, 892 (W. Va. 2017) (holding that no protected property interest exists in future agreements that have not been negotiated or

accepted; "unions have only a unilateral expectation that they will receive fees from nonunion employees" in the future).

The Commonwealth correctly argues that Kentucky law has long recognized that the police power, based on "the general welfare of the community," may validly infringe on the right to contract. *City of Covington v. Sanitation Dist. No. 1*, 301 S.W.2d at 888. As we noted above, "[t]he exercise of such a power must be reasonable and in conformity with the necessity of the case and have a substantial basis for the action." *Id.* at 889. Based on our previous discussion regarding the legislature's stated reasons for enacting the Act, we hold the Act satisfies this test.

### D.    *Emergency Legislation.*

Finally, the Unions argue that the legislature impermissibly designated the Act as emergency legislation in violation of Section 55 of the Kentucky constitution, and that the trial court erred by failing to consider this argument. The trial court reasoned that the court is not the proper body to determine whether the stated emergency existed, and that the legislature is merely required to state an emergency purpose. This constitutional section states:

> No act, except general appropriation bills, shall become a law until ninety days after the adjournment of the session at which it was passed, except in cases of emergency, when, by the concurrence of a majority of the members elected to each House of the General Assembly, by a yea and nay vote, entered upon their journals, an act may become a law when approved by the Governor; but the reasons for the emergency that justifies this action must be set out at length in the journal of each House.

KY. CONST. § 55. The reason set forth in the Act was that "it is critical to the economy and citizens of Kentucky to attract new business and investment into

37

the Commonwealth as soon as possible, an emergency is declared to exist, and this Act takes effect upon its passage and approval by the Governor or upon its otherwise becoming a law." 2017 Ky. Acts ch. 1, § 14.

In *Am. Ins. Ass'n v. Geary*, 635 S.W.2d 306, 307 (Ky. 1982), we held that while a legislative determination of emergency is subject to judicial review, "legislative judgment in that respect must be accorded the same presumption of validity that it enjoys in other instances of constitutional inquiry." Thus, if "any rational basis for concluding that the circumstances cited as constituting an emergency justified more expeditious action than would ordinarily be true, the courts should not interfere with the legislative discretion." *Id.* And, "when the reason for declaring an emergency is sufficiently expressed in the legislation itself, the requirement that it be recited in the journal is satisfied." *Id.*

In this case, and although the Unions disagree, we are unable to conclude that the legislature's proffered reason for an emergency has no rational basis. We therefore will not disturb that determination.[29]

### V.   Conclusion.

Based on the foregoing reasons, we hold that the Unions' constitutional challenges to the Act are without merit. In this area of economic legislation,

---

[29] Even if we were to agree with the Unions, the Act would not be rendered void. First, we note that the Act has a severability clause, such that the invalidity of any section does not affect the other provisions. 2017 Ky. Acts ch. 1, § 13. Second, even absent a severability clause and an invalid emergency provision, the Act became effective ninety days following the adjournment of the legislature. KY. CONST. § 55; *see McIntyre v. Commonwealth*, 221 Ky. 16, 20, 297 S.W. 931, 933 (1927) (holding that when emergency clause in bill was ineffective, "the bill took effect 90 days after the adjournment of the [l]egislature[]").

the legislature and the executive branch make the policy, not the courts. Long ago, in an opinion upholding a provision of the Railway Labor Act that authorized a union shop agreement notwithstanding a state's right-to-work law, Justice William O. Douglas aptly wrote, "[m]uch might be said pro and con if the policy issue were before us." *Ry. Emps. Dep't v. Hanson*, 351 U.S. 225, 233, 76 S. Ct. 714, 719, 100 L. Ed. 1112 (1956). But, he continued,

> the question is one of policy with which the judiciary has no concern. . . . [The legislature], acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which [the legislature] exercises.

*Id.* at 234, 76 S. Ct. at 719 (emphasis added).[30] We therefore AFFIRM the Franklin Circuit Court's Order dismissing the complaint.

---

[30] Justice Felix Frankfurter, concurring in *Railway Employees'*, concluded his opinion with the following quotation:

> "Where there is, or generally is believed to be, an important ground of public policy for restraint, the Constitution does not forbid it, whether this court agrees or disagrees with the policy pursued. It cannot be doubted that to prevent strikes, and, so far as possible, to foster its scheme of arbitration, might be deemed by Congress an important point of policy, and I think it impossible to say that Congress might not reasonably think that the provision in question would help a great deal to carry its policy along. But suppose the only effect really were to tend to bring about the complete unionizing of such railroad laborers as Congress can deal with, I think that object alone would justify the act. I quite agree that the question what and how much good labor unions do, is one on which intelligent people may differ; I think that laboring men sometimes attribute to them advantages, as many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind; but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large."

*Ry. Emps.*, 351 U.S. at 241–42, 76 S. Ct. at 723 (Frankfurter, J., concurring) (quoting *Adair v. United States*, 208 U.S. 161, 191–92, 28 S. Ct. 277, 287, 52 L. Ed. 436 (1908) (Holmes, J., dissenting)).

These quotations apply equally to both the Kentucky legislature and the United States Congress. In 2018, several members of the Kentucky House minority party filed a bill to

All sitting. Minton, C.J., Hughes and Venters, JJ., concur. Minton, C.J., concurs by separate opinion in which Hughes and Venters, JJ., join. Keller, J., dissents by separate opinion in which Cunningham and Wright, JJ., join. Wright, J., dissents by separate opinion in which Cunningham and Keller, JJ., join.

MINTON, CJ., CONCURRING: I completely concur with the majority's well analyzed opinion. I write separately to address the weaponization of Sections 59 and 60 in accompanying opinions in both this case and *Commonwealth v. Ezra Claycomb*.[31] I feel compelled to speak up because I fear this Court risks overstating its role in Kentucky's tripartite government.[32]

"Section[s] 59 [and 60] . . . prohibit[] 'local or special acts.'"[33] "The primary purpose of . . . [Sections] 59 [and 60] is to prevent special privileges, favoritism and discrimination, and assure equality under the law."[34] "A special law is legislation which arbitrarily or beyond reasonable justification discriminates against some persons or objects and favors others."[35] "Simply

---

reverse the Act. 2018 HB 237. Granted, this bill did not receive a hearing, but that fate was similar to that of any number of minority party bills seeking passage of right-to-work legislation prior to 2017. On the federal level, since § 14(b) of the Taft-Hartley Act represents an exception to federal preemption in labor-management relations, Congress can change that as well.

[31] 2017–SC–000614–TG (Ky. Nov. 15, 2018).

[32] *See Hayes v. State Property and Bldgs. Com'n*, 731 S.W.2d 797, 799 (Ky. 1987) ("Our role is not that of a super legislature.").

[33] *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459, 466 (Ky. 1998).

[34] *Kentucky Harlan Coal Co. v. Holmes*, 872 S.W.2d 446, 452 (Ky. 1994) (overruled on other grounds).

[35] *Bd. of Educ. of Jefferson Cty. v. Bd. of Educ. of Louisville*, 472 S.W.2d 496, 498 (Ky. 1971).

because legislation deals with a special subject matter does not mean it is special legislation."[36]

As it currently stands, "[t]he test as to whether legislation is special was formulated by this Court in *Schoo v. Rose*.[37] In order for legislation to be permissible under [Sections] 59 [and 60] . . . '(1) [i]t must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification.'"[38]

Considering the accompanying opinions of my colleagues in this case and others, I am convinced that continued adherence to the *Schoo* test is untenable. It would appear from our precedent that the determination of whether certain legislation constitutes unconstitutional special legislation rests in the hands of a majority of the seven Kentucky Supreme Court justices who can choose to define the "class" at issue in whatever way they would like, because under the first prong of the *Schoo* test, how one defines the "class" determines whether legislation is constitutional or not.

For example, Justice Keller, instead of articulating how the "class" at issue should be determined under our "longstanding precedent," accepts the Commonwealth's articulation of the "class" created by the Right to Work Act ("RTWA") as "all employers" and "all employees." This articulation of the "class"

---

[36] *St. Luke Hosp., Inc. v. Health Policy Bd.*, 913 S.W.2d 1 (Ky. App. 1996) (citing *Kling v. Geary*, 667 S.W.2d 379 (Ky. 1984)).

[37] 270 S.W.2d 940 (Ky. 1954).

[38] *Yeoman*, 983 S.W.2d at 466 (quoting *Schoo*, 270 S.W.2d at 941) (internal citations omitted).

at issue leads the dissent to then conclude that because the RTWA treats certain employers and employees differently from others—employees under an existing contract mandating labor-organization participation entered into before January 9, 2017, still must contribute to the labor organization, unlike all other employees—the RTWA is unconstitutional special legislation. Justice Wright, on the other hand, has defined the class as "contracts." And because he argues that the RTWA treats some types of contracts differently than others, he concludes in dissent that the RTWA constitutes unconstitutional special legislation.

But instead of defining the "class" at issue in the present case as "all employers" and "all employees," or "contracts," what if we chose to define the "class" as "all labor organizations" because the RTWA is really targeting labor organizations? The RTWA does not differentiate treatment between, for example, labor organizations in western Kentucky versus those in eastern Kentucky—all labor organizations must refrain from forcing employee participation—so therefore the RTWA applies equally to all within the "class." And this simple "reclassification," turns what was once unconstitutional special legislation into constitutional legislation. Simply choosing to define the "class" at issue differently than my colleagues in the dissent changes the outcome.

As evidenced above, how this Court defines the "class" at issue could mean the difference between rendering legislation constitutional versus unconstitutional. Such a fluid determination in defining the "class" at issue—in

42

conjunction with the *Schoo* test's rigid rule that the law "must apply equally to all in a class" or else the law is unconstitutional—gives the judiciary too much leeway.[39]

Justice Keller believes that I have conceded that the RTWA is unconstitutional special legislation under the *Schoo* test. I do not concede that point at all. Justice Keller's conclusion here misses my point: the dissent argues the unconstitutionality of the RTWA under "longstanding Kentucky precedent" that fails to articulate *any* rule for defining the "class" at issue to which the *Schoo* test then applies. Under the "longstanding Kentucky precedent" that the dissent claims faithfully to apply, a majority of this Court can strike down legislation based on a completely subjective determination of the "class" at issue.

To provide guidance to the judiciary on the important issue of judging whether a piece of legislation constitutes unconstitutional special legislation, I find great wisdom in the words of former United States Supreme Court Justice Benjamin Cardozo. In his analysis of whether a Maryland statute constituted unconstitutional special legislation under Maryland's Constitution, Justice Cardozo stated:

> Time with its tides brings new conditions which must be cared for by new laws. Sometimes the new conditions affect the members of a class. If so the correcting statute must apply to all alike. Sometimes the new condition affects only a few. If so, the correcting statute may be as narrow as the mischief. The [Maryland] Constitution does not prohibit special laws inflexibly

---

[39] *See Hayes v. State Property and Bldgs. Com'n,* 731 S.W.2d 797, 799 (Ky. 1987) ("Our role is not that of a super legislature.").

and always. It permits them when there are special evils with which the general laws are incompetent to cope. The special public purpose will sustain the special form . . . . The problem . . . is one of legislative policy, with a wide margin of discretion conceded to the lawmakers. Only in the case of plain abuse will there be revision by the courts . . . . If the evil to be corrected can be seen to be merely fanciful, the injustice or the wrong illusory, the courts may intervene and strike the special statute down . . . . If special circumstances have developed of such a nature as to call for a new rule, the special act will stand.[40]

In Kentucky, the General Assembly is constitutionally entrusted with identifying in changing times what it believes to be mischief and the ability to try to remedy that mischief. In this case, the General Assembly believes that forced labor-organization membership, or at least forced contribution to a labor organization, is a problem. So it enacted the RTWA, which prevents employees in Kentucky from being forced to support organized labor.

In other words, the General Assembly identified a "condition [that] must be cared for by . . . law[,]" i.e., forced labor organization participation. This "condition[] affects the members of a class," i.e., employees who are forced into support of a labor organization. The "class" is to be determined as such: who or what is being adversely affected by the condition that the legislation seeks to remedy.[41] As stated, the "class" in this case is "employees who are forced into labor organization membership [or support]" because they are the individuals who are being "adversely affected" by the condition that the legislation seeks to

---

[40] *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 46 (1933); *see also* Jabez G. Sutherland, *Statutes and Statutory Construction*, 2 Sutherland Statutory Construction § 40:6 (7th ed. Nov. 2018 update).

[41] Necessarily, the "condition that the legislation seeks to remedy" must be legitimate.

remedy, i.e., forced labor-organization participation. Justice Keller believes that I have defined the "class" at issue as "labor organizations," but fails to recognize that "employees who are forced into labor organization membership" is the class I espouse, having used "labor organizations" earlier simply to illustrate my point about the untenable nature of the *Schoo* test.

The "correcting statute" in the present case, the RTWA, seemingly does not "apply to all alike," because of the grandfathering-in of pre-January 9, 2017, agreements providing for forced labor-organization participation of employees. In other words, certain employees within the class are being treated differently from other employees within the class because employees bound by pre-January 9, 2017, agreements continue to be forced into labor-organization support. But rendering the RTWA unconstitutional simply on this fact fails to consider Justice Cardozo's wisdom, which seemingly applies an exception to the general rule that that "statute must apply to all alike": "[Kentucky's] constitution does not prohibit special laws inflexibly and always. It permits them when there are special evils with which the general laws are incompetent to cope."[42] The only reason that the RTWA does not treat all employees the same in this instance is that doing so would potentially violate other constitutional provisions, namely, the Contracts or Takings Clauses or both. In this way, a general law would be "incompetent to cope" with a condition our legislature considers to be a "special evil."

---

[42] *Id.*

45

Under the *Schoo* test, however, the General Assembly would apparently be prohibited from attempting to remedy what it believes to be a problem because either (1) the RTWA, if applied to all employees, will violate the Contracts or Takings Clauses, or both, or (2) the RTWA, as it currently stands, is unconstitutional special legislation. This line of thinking, taken to its natural conclusion, would mean that any time parties have entered into a contract, and the General Assembly decides that those kinds of contracts are bad public policy and creates a law preventing such contracts, the law is either (1) unconstitutional special legislation if it exempts from its application contracts already entered into by parties or (2) unconstitutional under the Contracts or Takings Clause if no exemption is afforded. Such an interpretation blocks the General Assembly from ever acting to remedy a purported problem, which is simply an untenable conclusion.

This is Justice Cardozo's point: Determining whether legislation constitutes unconstitutional special legislation requires a flexible analysis, ascertaining the reasons behind everything the legislature is doing. What is the "condition" the legislature is attempting to remedy? Why is the legislature treating one class differently from another? Why is the legislature treating some members of the class differently from others? Does the legislature have good reasons for doing all of this?

Rather than simply striking down legislation because some people or entities are being treated differently from others, both outside and within the "class" at issue, we must ask *why* this is the case. Such an analysis is in exact

conformance with an Equal Protection Clause analysis. The Equal Protection Clause does not render legislation unconstitutional simply because certain people are treated differently from others. A law that treats people belonging to suspect classes differently from others is not unconstitutional simply on that fact alone. Rather, a law that treats people belonging to suspect classes differently from others is unconstitutional if that law fails to satisfy strict scrutiny review, i.e., if no compelling government interest for doing exists or if the law is not narrowly tailored to accomplish its end.[43]

Under the *Schoo* test, different treatment of certain members of a class renders a law unconstitutional special legislation. Respectfully, I think that this is an untenable restriction on the legislature's ability to act to solve problems and offends the doctrine of separation of powers. In my view, we should analyze whether a law constitutes special legislation, applying the good judgment of Justice Cardozo: "Only in the case of plain abuse will there be revision by the courts . . . . If the evil to be corrected can be seen to be merely fanciful, the injustice or the wrong illusory, the courts may intervene and strike the special statute down . . . ."[44]

The *Schoo* test proves to be unworkable because of the mystery as to how the "class" at issue is to be defined. Yet the *Schoo* test, and really all our special legislation precedent, proves to be untenable in another way—by suggesting

---

[43] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

[44] *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 46 (1933); *see also* Jabez G. Sutherland, *Statutes and Statutory Construction*, 2 Sutherland Statutory Construction § 40:6 (7th ed. Nov. 2018 update).

different ways of analyzing the second prong. Consider the following statements this Court has made over the years about the special legislation analysis:

> "A special law is legislation which *arbitrarily or beyond reasonable justification* discriminates against some persons or objects and favor others."[45]

> "When asserting the validity of a classification, *the burden is on the party claiming the validity of the classification* to show that there is a valid nexus between the classification and the purpose for which the statute in question was drafted. There must be *substantially more than merely a theoretical basis for a distinction.* Rather, there must be a *firm basis in reality.*"[46]

> "[T]he classification [must] bear[] a *'reasonable relation to the purpose of the Act.'*"[47]

> "[T]here must be a *substantial and justifiable reason* apparent from legislative history, from the statute's title, preamble or subject matter, or from some other authoritative source."[48]

No wonder the trial court in this case and in *Claycomb* had trouble articulating how to analyze the second prong of the *Schoo* test. And the dissent offers no guidance as to how courts are to do so while continuing to profess faith in the *Schoo* test as binding precedent. For example, the dissent places the burden on the Commonwealth to articulate the reasons for upholding certain legislation. This may conform to how *Yeoman* has articulated the rule, but it is not in conformance with *Com., Revenue Cabinet v. Smith,* another case involving a

---

[45] *Bd. of Educ. of Jefferson Cty. v. Bd. of Educ. of Louisville,* 472 S.W.2d 496, 498 (Ky 1971).

[46] *Yeoman v. Com., Health Policy Bd.,* 983 S.W.2d 459, 468 (Ky. 1998).

[47] *Louisville/Jefferson Cty. Metro Gov't v. O'Shea's-Baxter, LLC,* 438 S.W.3d 379, 383 (Ky. 2014) (quoting *Mannini v. McFarland,* 172 S.W.2d 631, 632 (Ky. 1943)).

[48] *Tabler v. Wallace,* 704 S.W.2d 179, 186 (Ky. 1985).

special legislation challenge: "Notably, the burden *on the ones attacking the [legislation] is the negation of every conceivable basis which might support it.*[49] No wonder no one can articulate how we evaluate special legislation challenges.

Justice Keller's final point is a suggestion that I have applied different "readings" of our constitutional provisions in *Claycomb* versus this case. This suggestion fails to appreciate the fundamental difference between the two provisions. Section 14, at issue in *Claycomb*, involves pure constitutional language that plainly proscribes "delay" in the ability to seek a remedy through the courts. Sections 59 and 60, on the other hand, proscribe "special" legislation—*special* is a vague term that has been defined and redefined by precedent from this Court. And, relying on our precedent, what exactly is meant by "special" legislation? The dissent insists on adherence to "longstanding Kentucky precedent" in which our Court has attempted unsuccessfully to define what makes legislation *special.* But truly that precedent is unworkable today.

And while stare decisis is an important guiding principle, it is not absolute:

> *Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent "is *usually* the wise policy, because in most matters it is more important than the applicable rule of law be settled than it be settled right." *Nevertheless, when governing decisions are unworkable or are badly reasoned, "this Court has never felt*

---

[49] *Com., Revenue Cabinet v. Smith,* 875 S.W.2d 873, 875 (Ky. 1994) (applying rational basis review to a special legislation challenge).

49

*constrained to follow precedent."* Stare decisis *is not an inexorable command; rather, it "is a principle of policy and not a mechanical formula of adherence to the latest decision." This is particularly true in constitutional cases, because in such cases "correction through legislative action is practically impossible."* Considerations in favor of *stare decisis* are at their acme *in cases involving property and contract rights, where reliance interests are involved*; the opposite is true in cases . . . involving procedural and evidentiary rules.[50]

In the words of this Court: "[This Court is] 'not assigned the duty of maintaining the watch as the law ossifies.' At times, through proper analysis, sound jurisprudence mandates we refuse to 'unquestioningly follow prior decisions.'"[51]

Finally, I agree with the majority's conclusion that the Act does not violate Section 55 of Kentucky's Constitution and find the dissent's opposing conclusion unavailing. I only wish to make clear, as the majority seemingly has, that Section 55 cannot, in and of itself, make an otherwise constitutionally sound piece of legislation unconstitutional. "As the Kentucky Supreme Court has explained, if the emergency clause of an otherwise valid statute is invalid, then the statute takes effect at the time it would have become law without an emergency clause."[52] Essentially, even if a violation of Section 55 existed, this point would be moot today because the RTWA would take effect 90 days after adjournment of the session in which it was passed, instead of immediately

---

[50] *Payne v. Tennessee*, 501 U.S. 808, 827-28 (1991) (internal citations omitted) (emphasis added).

[51] *Commonwealth v. Terrell*, 464 S.W.3d 495, 501 (Ky. 2015) (internal citations omitted)

[52] *Pucket v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 607 n.4 (6th Cir. 2016) (citing *Lyttle v. Keith*, 95 S.W.2d 299, 300 (Ky. 1936)).

taking effect. As it stands now, more than 90 days have elapsed since the final adjournment of the 2017 regular session in which the RTWA passed.

Hughes and Venters, JJ., join.

KELLER, J., DISSENTING: I concur with the majority opinion's holding that the RTWA survives an equal protection challenge *if* the rational basis test is the appropriate level of scrutiny to apply; I also agree that the RTWA is not a violation of the Takings Clause. However, I respectfully dissent from the majority opinion's holding that the RTWA was not passed in contravention of Kentucky's Constitution relating to special and emergency legislation.[53]

**Section 59 and Special Legislation.**

### A. The delegates at the 1891 Constitutional Convention made the barring of special legislation a priority.

Lawmakers at the 1891 Constitutional Convention in Kentucky were concerned not just with special laws being enacted for railroad companies, but for all corporations and localities that had enacted laws specific to them. "The universal disapproval of every person in Kentucky suggested sharp and effective remedies for the evils of such a system of law-making. Outside of all questions of economy the demoralization of the Legislature, the inequality of laws so passed had produced the grossest of wrongs, and the demand for a

---

[53] I also do not share the majority's opinion as to the applicability of the United States Supreme Court's recent decision in *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, __ U.S. __, 138 S.Ct. 2448 (2018). *Janus* was specific to public sector employees and does not provide relevance to the resolution of the case before this Court.

51

change on this subject was absolute and universal." 1890 KY. CONST. DEBATES, at 5566-67.

"[T]he primary purpose of section 59 was to prevent special privileges for those with wealth and power sufficient to sway the Assembly and to ensure equality under the law." *White v. Manchester Enterprise, Inc.*, 910 F.Supp. 311, 314 (E.D. Ky. 1996). "Unbridled legislative power had become the captive of special interest groups. Concern for limiting the powers of the legislature in general, and with cutting off special and local legislation in particular, was the primary motivating force behind enactment of the new Kentucky Constitution of 1891." *Tabler v. Wallace*, 704 S.W.2d 179, 184 (Ky. 1985).

In discussing Section 60 of the Constitution, which also deals with special legislation, the following statements were recorded: "Therefore, that, whilst the law was uniform and general in its provisions, it was not uniform and general in its operation, but was special and local in its operation, dependent entirely upon the will of a particular locality." 1890 KY. CONST. DEBATES, at 5762. "The very definition of a general law is that it must be uniform." *Id.* Legislators were concerned with all special legislation, not only in its written form, but also in its application.

## B. Section 59 requires that a law apply equally to all in a class.

Section 59 of the Kentucky Constitution prohibits special legislation and states, in relevant part:

> The General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely:

Twenty-fourth: To regulate labor, trade, mining or manufacturing.

. . .

Twenty-ninth: In all other cases where a general law can be made applicable, no special law shall be enacted.

For a law to be general in its constitutional sense it must meet the following requirements: (1) it must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification. *Yeoman v. Com, Health Policy Bd.*, 983 S.W.2d 459, 466 (Ky. 1998). It is clear that the way the Court draws the "class" has a great impact on the special legislation analysis.

"[T]he fact that the legislature deals with a special subject (such as charitable gaming) does not necessarily make it special legislation." *Commonwealth v. Louisville Atlantis Community/Adapt, Inc.*, 971 S.W.2d 810, 819 (Ky. App. 1997). **"A general law applies to persons or things as a class, while a special law relates to particular persons or things of a class**[.]" *Id.* (quoting *Commonwealth v. Smith*, 975 S.W.2d 873, 877 (Ky. 1994) (emphasis added). Special legislation "does not have a uniform operation." *Reid v. Robertson*, 200 S.W.2d 900, 903 (Ky. 1947). "[A] statute does not have a uniform operation if it does not relate to persons, entities, or things as a class, but to particular persons, entities or things of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitations, be applicable." *Id.* This includes statutes that "are not general in their application to the class to

which they apply, do not bring within their limits all those who are in substantially the same situation or circumstances, or who stand upon the same footing regarding the subject of the legislation, but which, to the contrary, discriminate between persons of the same class doing the same act." *Id.* While common sense dictates that the legislature is not forbidden to pass laws dealing with labor, this constitutional provision imposes further analysis for constitutional scrutiny when privilege for or discrimination against a special class is alleged. Such constitutional scrutiny requires looking at the plain language of the applicable provisions and then applying the law to the facts of this case. The majority cites to numerous cases for the proposition of showing what a special or general law is, or is not, and to show where courts of this Commonwealth have held laws not violative of Section 59. The majority concludes, without analysis, that the legislature's rational basis for passing the RTWA is enough to survive constitutional attack. Such conclusions run afoul of the principles of constitutional interpretation and the plain language of Section 59.

The law must apply equally to all in a class and there must also be distinctive and natural reasons supporting the classification. Otherwise, the legislation is constitutionally invalid and must be struck as impermissible special legislation. *Yeoman*, 983 S.W.2d at 466. "There must be substantially more than merely a theoretical basis for a distinction. Rather, there must be a firm basis in reality." *Id.*

54

The RTWA provides that no employee is required to become, or remain, a member of a labor organization, or to pay dues, fees, or assessments to a labor organization. The RTWA only applies to employment and union contracts after January 9, 2017, the effective date of the RTWA. The Commonwealth argues that the class under the RTWA is "all employers" and "all employees" in the state.

Accepting this classification as true, the RTWA treats employers and employees within the class differently. The methods and practices of those employers and employees associated with labor organizations are not only altered, but are extinguished going forward. The employers and employees not associated with labor organizations are left in the same position as they were prior to the RTWA. Not only does the RTWA treat union employers and employees disparately to non-union employers and employees, the RTWA applies differently to union employers and employees based on their date of employment, namely, union members prior to January 9, 2017 are exempted. The reasoning for this, of course, is that if the RTWA applied to union contracts prior to this date, it would violate the contracts and taking clauses of the Kentucky and federal Constitutions.[54]

---

[54] This writer does not believe that every piece of legislation that has "grandfather" provisions will be deemed impermissible legislation. Constitutionality is decided on a case by case basis, and, despite the majority opinion's contention that this dissenting opinion would hold all grandfather provisions unconstitutional, such attacks would have to undergo the rigorous constitutional analysis engaged herein.

Nevertheless, the RTWA, on its face, treats the union members prior to January 9, 2017 differently than other employees in the state and differently than employees of labor organizations after January 9, 2017. KRS 336.130(3) specifies that ". . . no employee shall be required, as a condition of employment or continuation of employment, to . . . [p]ay . . . any dues, fees, assessments, or similar charges of any kind or amount to a labor organization . . . ." The restriction on payments is explicitly limited to labor organizations as a condition of employment or continuation of employment. Thus, the statute clearly fails to "operate alike on all individuals and corporations." *Jefferson Cnty. Police Merit Bd. v. Bilyeu*, 634 S.W.2d 414, 416 (Ky. 1982) (citing *City of Louisville v. Kuntz*, 104 Ky. 584, 47 S.W. 592, 592-93 (1898)).

Even if we adopt the Commonwealth's proposition that the RTWA is general in its written form, the legislation is special in its operation because it only alters membership and dues for union employers and employees. This is a violation of the legislative intent of the 1891 constitutional convention and the *Yeoman* test: "it must *apply equally* to all in a class." *Yeoman*, 983 S.W.2d at 466 (emphasis added).

The Commonwealth argues that no other state has held right to work acts unconstitutional. After a thorough search of the constitutional provisions in other jurisdictions, only one case was revealed that alleged right to work laws were a violation of that state's special legislation provision. That case was *Eastern Oklahoma Bldg. & Const. Trades· Council v. Pitts*, 82 P.3d. 1008 (Okla. 2003), which held the right to work law was constitutional and not a violation

56

of the constitutional provision. The reasoning was that the right to work law had been passed via constitutional amendment, and thus was not passed by the legislature in violation of the constitutional provision. *Pitts*, 82 P3d. at 1013-14.

Because the RTWA in the instant case was passed by the legislature, without any attendant constitutional amendment, I would hold that it is a violation of the Commonwealth's constitutional provision prohibiting special legislation.[55] Because of this unique constitutional directive, we cannot blindly follow the rulings of our sister courts from around the nation on this matter.

_____

[55] Although we find the RTWA unconstitutional under Sections 59 and 60 of the Constitution, we briefly mention the heightened rational basis standard that has been applied to constitutional challenges enhanced by the special legislation provisions. Consider this scenario: an independent contractor wants to negotiate with an employer that is a member of a labor organization. The independent contractor has the ability to negotiate the terms for the work provided, including payment and any benefits or conditions. The independent contractor could engage in this negotiation process before the passage of the RTWA and maintained such right after January 9, 2017. The passage of the RTWA did not eliminate union workers' abilities to contract with their employers. But what it did do was treat union workers' contracts prior to January 9, 2017 differently than those after the effective date. Collective bargaining units, and those whom the units represent, were deprived of the arm's length negotiation and contract relationships left undisturbed for non-union individuals and entities.

> [T]he equal protection provisions of the Kentucky Constitution are
> enhanced by Section 59 and 60. . . . So far as we can determine, none
> has anything like the combination of broad constitutional protection of
> individual rights against legislative interference vouchsafed by our 1891
> Kentucky Constitution. Because of this additional protection, we have
> elected at times to apply a guarantee of individual rights in equal
> protection cases that is higher than the minimum guaranteed by the
> Federal Constitution. Instead of requiring a "rational basis," we have
> construed our Constitution as requiring a "reasonable basis" or a
> "substantial and justifiable reason" for discriminatory legislation in areas
> of social and economic policy.

The concurring opinion appears to concede that the RTWA is unconstitutional if we apply our special legislation precedent that has been applicable since the adoption of our current Constitution. The concurrence takes issue with the two-part test in *Schoo v. Rose*, 270 S.W.2d 940 (Ky. 1954) and *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459 (Ky. 1998), and the identification of the "class" at issue. "When asserting the validity of a classification, the burden is on the party claiming the validity of the classification to show that there is a valid nexus between the classification and the purpose for which the statute in question was drafted." *Yeoman*, 983 S.W.2d at 468. What neither the concurring opinion nor the majority state, however, is that this dissenting opinion analyzes the "class" as that which was propounded by the Commonwealth itself for justification of the RTWA. The Commonwealth adamantly argued that the RTWA did not target labor organizations. To quote the Commonwealth's brief to this Court: "It [the RTWA] does not apply only to labor organizations, as the Appellants suggest. It applies to *all* organizations dealing with employers. It applies to *all* employers

---

*Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408, 418-19 (Ky. 2005) (internal citations omitted). This heightened rational basis standard was not applied by the circuit court, and proper analysis on this issue would require remand. This dissent holds that the RTWA is unconstitutional on other grounds, but notes that the level of scrutiny to be applied to this case is an important issue not to be overlooked.

Here, the RTWA treats business contracts negotiated by a union to perform work differently than it treats contracts negotiated by companies to perform work. Therefore, the statute constitutes special legislation in violation of Section 59 of the Kentucky Constitution.

and all persons in the Commonwealth." (emphasis in brief). The Commonwealth stated: "[S]ection 1 of the KRTW Act applies to _all_ Kentucky employees." (emphasis in brief).

Accepting that classification as true, as the Commonwealth has the burden of proving the validity of the legislation, the RTWA is unconstitutional special legislation as stated in this opinion and the concurrence. "This Court will not permit a statute to survive by simply defining a class in a narrow fashion which will yield, ipso facto, a self-sustaining classification." _Yeoman_, 983 S.W.2d at 468 (internal citations omitted). Had this writer drawn the class as the concurring opinion suggests – the class being all labor organizations – would we then be criticized for drawing the class too narrowly so as to create a self-sustaining classification? _See, id._ The RTWA would still be unconstitutional with the application of our controlling legal precedent because union employers and employees before January 9, 2017 are treated differently than those after that date. Of course, the concurring opinion would rather abandon our long-standing precedent than accept this result, but the consensus shows that the RTWA fails regardless of how the class is drawn.

The Commonwealth has maintained that, "economic development was the General Assembly's express purpose for enacting the KRTW Act,"[56] and labor organizations are not being singled out for disparate treatment because "*Other private organizations have never been allowed to compel the payment of*

---

[56] Commonwealth of Kentucky, Office of the Governor ex rel. Matthew G. Bevin, etc., Brief to Kentucky Supreme Court, p. 16.

*money from non-members to begin with.*[57]  A logical analysis of this evidence would look something like this: According to the Commonwealth, the purpose of the RTWA is to increase economic development and the Act applies to all employers and employees in the state.  Assuming the General Assembly intends economic development in the general sense, and not just non-union economic development, why would it choose to enact a law that, by the Commonwealth's own admission, will not affect non-union employers and employees because those private organizations have never received or compelled payment of money from members or nonmembers?  The Commonwealth's own arguments for classifications and for justifications of the RTWA fail to pass constitutional muster.

In *University of Cumberland v. Pennybacker*, 308 S.W.3d 668 (Ky. 2010), the legislature enacted a statute that provided scholarships for students who were enrolled or accepted for enrollment in a Kentucky pharmacy school and who would serve in Kentucky.  *Pennybacker*, 308 S.W.3d at 685.  Because the scholarship was limited to those students attending a pharmacy school with a main campus located in an Appalachian Regional Commission county in the Commonwealth, and only one such pharmacy school existed, this Court held the legislation to be violative of Section 59.  *Id.* at 684-85.  Because the scholarships were restricted to those attending a specific school, the General Assembly failed to treat equally all members of the class, despite the requisite

---

[57] *Id.* at p. 32.

60

"distinctive and natural" reasons for doing so. *Id.* at 685. The same is true here because, again, by the Commonwealth's own admission, the restrictions and prohibitions in the RTWA only affect union employers and employees because non-union employers and employees do not typically engage in this type of negotiated bargaining.

With all due respect to the wisdom and writing of former Justice Benjamin Cardozo, this Court is not bound by the 1933 interpretation of a provision in the Maryland state constitution. Citing several cases, "[t]he highest court of Maryland has considered this provision, and defined its meaning and effect. . . . Our endeavor in what follows is to extract the essence of the decisions and to give effect to it as law." *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 45-46 (1933) (internal citations omitted). The United States Supreme Court analyzed the special legislation challenge in *Williams* by looking at how Maryland's courts had interpreted Maryland law. Such analysis provides no relevance to us here today. "Unlike some jurisdictions, stare decisis has real meaning to this Court." *Yeoman*, 983 S.W.2d at 469. "Regardless of what the views of the Court as now constituted may be as to the soundness of the construction originally given the Constitution . . . we are of the opinion that the construction should be adhered to under the doctrine of stare decisis. . . . And since it is of the utmost importance that the organic law be of certain meaning and fixed interpretation, decisions construing a constitution should be followed in the absence of strong reasons for changing them." *Daniel's Adm'r v. Hoofnel*, 155 S.W.2d 469, 471-

61

72 (Ky. 1941) (internal citations omitted). Absent a constitutional amendment, "to change the interpretation of the present constitution which has been consistently adhered to . . ., would be to upset governmental policy followed since the foundation of the Commonwealth 150 years ago." *Id.* at 472.

But suppose we adopted the concurring opinion's proposition and analyzed special legislation under the framework of Justice Cardozo. "Rather than simply striking down legislation because some people or entities are being treated differently from others, both outside and within the "class" at issue, we must ask *why* this is the case."[58] In doing this, we would attempt to answer the questions: "Why is the legislature treating one class differently from another? Why is the legislature treating some members of the class differently from others? Does the legislature have good reasons for doing all of this?"[59]

Why would the General Assembly enact a law that only affects labor organizations? What is the condition that the legislature is attempting to remedy? The Commonwealth could answer that its intention is to increase economic investment in the state. Another answer might be that the General Assembly simply disfavors unions. Why is the legislature treating some members of the class differently from others? Does the legislature have good reasons for doing all of this? If the goal is to increase economic investment, the law is greatly attenuated from the purpose because it provides no consequence, good or bad, to the majority of the employers and employees in the state –

---

[58] Concurring Opinion.

[59] *Id.*

those being non-union employers and employees. Even under this approach, the RTWA is special legislation. It treats members of a class differently, regardless of how such class is determined, and there is no legitimate reason for this disparate treatment, whether we are relying on the "express purpose" given by the Commonwealth or whether we conclude that this is anti-union legislation.

This discussion brings me to my final point on the issue of special legislation. Today this Court also renders its decision in *Commonwealth v. Claycomb*, 2017-SC-000614-TG (Ky. Nov. 15, 2018). In that case, the majority opinion endorses a strict reading of Section 14 of our state's constitution and interprets such provision based on the plain meaning of the words used. Yet, in the concurring opinion here, it is argued that determining whether legislation constitutes unconstitutional special legislation requires a *flexible* analysis. So, it appears that to some Justices, the method of constitutional interpretation used varies with the case and the constitutional provision at issue. Thus, as stated before, "the doctrine of stare decisis remains an ever-present guidepost in our undertaking." *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 795 (Ky. 2009). This guidepost is strengthened by the oath I have taken to uphold the Kentucky Constitution.

**Section 55 and Emergency Legislation.**

The unions argue that the RTWA was passed in violation of Section 55 of the Constitution dealing with emergency legislation. Section 55 states:

No act, except general appropriation bills, shall become a law until ninety days after the adjournment of the session at which it was passed, except in cases of emergency, when, by the concurrence of a majority of the members elected to each House of the General Assembly, by a yea and nay vote, entered upon their journals, an act may become a law when approved by the Governor; but the reasons for the emergency that justifies this action must be set out **at length** in the journal of each house.

Ky. Const. § 55 (emphasis added).

The "emergency" for the RTWA is that "it is critical to the economy and citizens of Kentucky to attract new business and investment into the Commonwealth as soon as possible, an emergency is declared to exist, and this Act takes effect upon its passage and approval by the Governor or upon its otherwise becoming a law." The RTWA became effective on January 9, 2017, when signed by the Governor, instead of ninety days after the legislative session pursuant to Ky. Const. § 55.[60]

The majority opinion cites to *Am. Ins. Ass'n v. Geary*, 635 S.W.2d 306, 307 (Ky. 1982), as holding that while a legislative determination of emergency is subject to judicial review, "legislative judgment in that respect must be

---

[60] The majority opinion cites to *McIntyre v. Commonwealth*, 297 S.W. 931, 933 (Ky. 1927), for the proposition that even if the emergency clause was ineffective, the bill would take effect 90 days after the adjournment of the legislature. *McIntyre*, as discussed below provides a detailed analysis of emergency legislation, but is distinguishable on this point. *McIntyre* dealt with an emergency act that created a term for the courts of Perry and Leslie Counties, due to congested dockets. McIntyre was indicted and convicted of murder during a time not provided for by the emergency act. Thus, the question on appeal was whether his conviction could be upheld despite the judgment being rendered when court could not be held pursuant to the act. *McIntyre* did not deal with a constitutional challenge to the act itself, but rather a challenge to the judgment of conviction attendant to the act. Such a distinguishing point should be noted, as a successful constitutional attack to the RTWA does not mean that the RTWA simply is deemed to have been effective 90 days after the end of the legislative session.

accorded the same presumption of validity that it enjoys in other instances of constitutional inquiry." If "any rational basis for concluding that the circumstances cited as constituting an emergency justified more expeditious action than would ordinarily be true, the courts should not interfere with the legislative discretion." *Geary*, 635 S.W.2d at 307. The majority concludes that the legislature's proffered reason for an emergency has a rational basis and will not be disturbed.

In *Geary*, HB 525 dealt with a surcharge upon insurance premiums collected in the state which funded a trust for the payment of incentives to firemen and policemen. *Id.* at 306. The emergency in the act stated:

> Whereas, the general fund appropriations for fiscal year 1981-82 for the professional firefighters foundation program fund as provided by KRS 95A.200 through 95A.990, and the law enforcement foundation program fund as provided by KRS 15.410 through 15.510 will lapse on June 30, 1982, an emergency is declared to exist, and Sections 6 and 9 of this Act, shall become effective on July 1, 1982, and all other sections of this Act shall become effective upon its passage and approval by the Governor.

In *Geary*, the Franklin Circuit Court had found that, while the reason contained in the act justifying an emergency was "woefully weak," it was not inclined to declare it unconstitutional. *Id.* An accurate recitation of the holding in *Geary* is as follows:

> Although we are of the opinion that **the court must have the ultimate authority of determining whether an emergency actually existed**, the legislative judgment in that respect must be accorded the same presumption of validity that it enjoys in other instances of constitutional inquiry. That is, if there is any rational basis for concluding that the ***circumstances cited as constituting an emergency justified more expeditious action***

65

***than would ordinarily be true***, the courts should not interfere with the legislative discretion.

*Id.* at 307 (emphasis added).

In *McIntyre v. Commonwealth,* 297 S.W. 931 (Ky. 1927), this Court's predecessor discussed emergency legislation at length. The Court there analyzed emergency legislation under our state constitution and compared emergency legislation to that in other states:

> The question also came before the Supreme Court of Illinois in *Graham v. Dye,* 308 Ill. 283, 139 N. E. 390. Although the Constitution of Illinois is not so explicit as the Constitution of Kentucky, the court, holding the act void where no actual emergency appeared, although one was attempted to be declared, said:

> "The Constitution does not authorize the passage of an emergency statute, except in case an emergency exists making it important, if not absolutely necessary to accomplish the full purpose of its enactment, that it take effect immediately upon its approval, and by plain language requires the expression of what the emergency is in the preamble or body of the act. To say the mere declaration that an emergency exists fulfills the requirement of the Constitution would be a plain disregard of the language that the emergency shall be expressed in the preamble or body of the act. The statement that an emergency exists is not an expression of the emergency."

*McIntyre v. Commonwealth,* 297 S.W. 931, 933 (Ky. 1927).

Based on *Geary* and the Court's acceptance of the Illinois court's rationale in *McIntyre,* I am even more convinced the RTWA violates the emergency legislation provision of Section 55. The stated emergency in *Geary* was "woefully weak," yet it stated more of a basis than the RTWA. The legislation in *Geary,* with specificity, noted that without expeditious action by the legislature, the incentives provided to firefighters and law enforcement via specific, enumerated statutes would lapse. No such specificity exists within

66

the RTWA. While the statute in the Illinois case, discussed in *McIntyre*, only stated that an emergency existed, but mentioned nothing about what the emergency was, the RTWA is similar. "To attract new business and investment into the Commonwealth as soon as possible" is not sufficient to satisfy the constitutional provision. If such were sufficient, the state needing more jobs, money and investment would be a pretext to the emergency passage of a myriad of laws. Would there ever be a time when attracting business and investment would not be a goal of the Commonwealth? This writer, as I would hope do most Kentuckians, possesses a desire for increased prosperity for our Commonwealth. However, this desire cannot manifest itself as a constitutional blanket which would cover otherwise infirm legislation.

*Geary* goes further and holds that the emergency must require more expeditious action than would ordinarily be true. *Geary*, 635 S.W.2d at 307. *Geary* involved a trust for state firefighters and police officers that was ready to lapse. There was sound reasoning and urgent need for more expeditious action in that case that is not present here. Therefore this Court should hold, under our clear precedent, that no emergency actually existed. *Id.*

The majority notes, and I would agree, that policy such as the economic policy which is at the core of the RTWA is within the purview of the General Assembly. The citizens, as voters, sit in judgment of the soundness of legislative policy. However, Sections 59 and 60 of the Kentucky Constitution are unique to the Commonwealth and to our jurisprudence. As a justice on this Court, I took an oath to uphold both the United States and Kentucky

67

Constitutions. This I must do, despite the direction of any prevailing political winds.

Thus, I would hold that the RTWA violates Sections 59 and 60, as well as Section 55 of the Kentucky Constitution, and is therefore unconstitutional on its face and in its application. Without commentary on the propriety of the RTWA as it relates to public policy, our General Assembly must follow the lead of Oklahoma. The policy espoused in the RTWA can properly be implemented in the Commonwealth of Kentucky via appropriate constitutional amendment.

Cunningham and Wright, JJ., join.

WRIGHT, J., DISSENTING: While I fully agree with Justice Keller's astute separate opinion, I write separately to further lay out my opinion on the matter. It is the distinguished role of this Court throughout the ages to be a stabilizing force, standing apart from the political headwinds which sweep through the legislative process. Legislation from our General Assembly is political in the making. Our decisions are non-political and are based on the guiding hand of our state constitution. If this Court is not vigilant in protecting equally the weak and the strong, the poor and the rich, the accused and the victims, then some individuals and some rights may be trampled underfoot. Social and economic issues are matters of legislative concern rather than this Court's—so long as basic constitutional mandates are satisfied. Yet, such mandates were not satisfied here.

It is the position of this dissent that the legislation in question fails because it does not meet the requirements and proscriptions of our state

constitution. More particularly, the legislation violates Section 59 of our state constitution.

Section 59 of the Kentucky Constitution provides greater protections than those of our sister states, as Justice Keller lays out. Section 59 of the Kentucky Constitution reads: "The General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: . . . [t]o regulate labor, trade, mining or manufacturing." Because of this unique constitutional directive, we cannot blindly follow the rulings of our sister courts from around the nation on this matter—unless we follow the lead of Oklahoma and do so through a constitutional amendment. As Justice Keller notes, when Oklahoma (the only other state with similar protections) enacted its so-called "Right to Work" law, it did so through an amendment to its state constitution.

We have held the purpose of Section 59 is to "prevent special privileges, favoritism, and discrimination, and to [e]nsure equality under the law." *Ky. Harlan Coal Co. v. Holmes,* 872 S.W.2d 446, 452 (Ky. 1994). Section 59 prevents the enactment of laws that do not "operate alike on all individuals and corporations." *Jefferson Cnty. Police Merit Bd. v. Bilyeu,* 634 S.W.2d 414, 416 (Ky.1982) (citing *City of Louisville v. Kuntz,* 104 Ky. 584, 47 S.W. 592, 592–93 (1898)). I point out that, "in order for a law to be general in its constitutional sense it must meet the following requirements: (1) it must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification." *Kentucky Harlan Coal Co.,* 872 S.W.2d at 452.

69

Thus, to determine whether the statute is special legislation we must first determine what the class consists of and whether the statute treats all class members equally. KRS 336.132 specifically states that "[a]ny agreement, understanding, or practice, written or oral, implied or express, between any labor organization and employer which violates an employee's rights as set forth in subsection (3) of Section 1 of this Act shall be unlawful and void, . . . ." An agreement or understanding is a contract and the statute restricts what an agreement or understanding can require. Therefore, it is clear that the statute places restrictions on the freedom of contract. As this Court has acknowledged, the Commonwealth has "very substantial policies in favor of the freedom of contract." *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 880 (Ky. 2013). This right to freedom of contract is equally important to those of all political and socioeconomic backgrounds—from business owners to unions and from white collar workers to blue.

After looking at the class, the next question we must examine is whether the legislation places the restriction equally on all contracts. KRS 336.130(3) specifies that "no employee shall be required, as a condition of employment or continuation of employment, to . . . [p]ay any dues, fees, assessments, or similar charges of any kind or amount to a labor organization . . . ." The restriction on payments is explicitly limited to labor organizations as a condition of employment or continuation of employment. Thus, the statute clearly fails to "operate alike on all individuals and corporations." *Bilyeu*, 634 S.W.2d at 416.

70

Webster's Dictionary defines employ as "1. To put to service or use. 2. To apply or devote (e.g., time) to an activity. 3. a. To put to work. b. To provide with gainful work." *Webster's II New Riverside University Dictionary* 429 (1994). This definition would cover people working under a contract negotiated by a union and those who are not. The problem with the statute arises because it does not cover all members of the class. It would cover union contracts—but not other contracts between employees and employers.

Unions negotiate business agreements—often incurring large costs in the process. Unions must invest in a strike fund in case contract negotiations necessitate a strike, spend countless man hours, and expend various other resources in negotiating the contract. All employees get the benefits of the contract in terms of wages and benefits whether they are union members or nonunion workers. Under prior law, nonunion workers under the contract would have to cover their proportional share of the union's cost of negotiating and enforcing the contract. Even under this prior law, the nonunion workers were exempt from paying any part of union costs for any activity beyond the cost of the contract under which they are working. For example, they were not required to contribute to any political activity of the union. The legislation that has been designated as "Right to Work" gives these employees the benefit of working under a contract that was negotiated at considerable cost, yet prohibits the contract from requiring that the nonunion worker pay any share of the cost of the contract. No other contracts are treated in this manner under our laws.

I will offer a couple examples to better illustrate my point. Assume a company called Work Development, Inc., negotiated a contract to supply vehicle parts to Toyota. Work Development, Inc., incurred the expense of negotiating the terms and conditions of the work they would perform on behalf of Toyota as well as the expenses incident to developing the specifications for the part. The contract negotiated by Work Development, Inc., would be an employment contract since it amounts to an agreement to do gainful work for someone else. The question then arises: would the statute prohibit Work Development, Inc., from negotiating a contract that would make it the sole provider for the part? It would not. Would the statute require Work Development, Inc., to share the negotiated terms of the contract and force it to share the proprietary information on the productions specifications with any competitor who wished to supply the same part to Toyota? No. Would the statute prohibit Work Development, Inc from negotiating compensation for its work in developing the contract or requiring any competitor to pay a proportional share of the cost of developing the specification of the component part if a competitor were to make and supply some parts under said contract? No.

While this statute would not prohibit Work Development, Inc. from negotiating such a contract, the statute prohibits just such conduct by labor unions. Therefore, Work Development, Inc., would be treated differently under the statute than a union—even though both the union and Work Development, Inc., negotiated contracts to do work for someone else. Therefore, this statute

72

fits the very definition of special legislation—as it treats one member of the class (a company negotiating a contract for employment) differently than another (a union negotiating the same type of contract).

Let us look to a different example. Suppose a landowner wishes to have a boundary of coal mined. With that goal in mind, the property owner negotiates a contract with a company called Coal Works, Inc., to mine the coal. Coal Works would have to do the work of developing and applying for a mining permit. Upon receiving the permit, Coal Works would be tasked with building roads across the property to the location of the coal boundary. Does the statute prohibit Coal Works from negotiating contracts stating they have the exclusive right to mine the coal? No. If another company mines part of the coal, would the statute prohibit the contract from providing that a proportional share of the cost of developing the permit and building the roads being paid to Coal Works? Certainly not. However, the statute prohibits a union from being compensated for the work it does in negotiating a contract. This statute would not have the same effect on Coal Works' contract to do the work of mining the coal for someone else as it would on a union's contract to perform work.

Here, the statute treats business contracts negotiated by a union to perform work for someone differently than it treats contracts negotiated by companies to perform work for someone. Therefore, the statute constitutes special legislation in violation of Section 59 of the Kentucky Constitution.

Cunningham and Keller, JJ., join.

COUNSEL FOR APPELLANTS: FRED ZUCKERMAN, AS REPRESENTATIVE OF THE GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 89 AND WILLIAM LONDRIGAN, AS REPRESENTATIVE OF THE KENTUCKY STATE AFL-CIO, ITS AFFILIATED UNIONS AND MEMBERS

William E. Johnson
Johnson Bearse, LLP

Robert Matthew Colone
Teamsters Local 89

David O'Brien Suetholz

Irwin H. Cutler, Jr.
Benjamin S. Basil
Matthew P. Lynch
Priddy Cutler Naake & Meade PLLC

Devon Nora Ros Oser
Branstetter Stranch & Jennings
PLLC

COUNSEL FOR APPELLEE: MATTHEW G. BEVIN, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

Mark Stephen Pitt
Stephen Chad Meredith
Matthew Kuhn
Office of the Governor

COUNSEL FOR APPELLEE: DERRICK K. RAMSEY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE KENTUCKY LABOR CABINET

Michael Gary Swansburg, Jr.

COUNSEL FOR APPELLEES BARRY BRIGHT, JACOB PURVIS, AND WILLIAM PURVIS

William L. Messenger
National Right to Work Foundation

Richard Lynn Masters
Masters, Mullins, & Arrington

COUNSEL FOR AMICUS CURIAE: KENTUCKY CENTER FOR ECONOMIC POLICY

Pamela Joy Pendorf Thomas

COUNSEL FOR AMICI CURIAE: INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; UNITED MINE WORKERS OF AMERICA; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION; AND KENTUCKY PIPE TRADES ASSOCIATION:

Kevin Crosby Burke
Jamie Kristin Neal
Burke Neal PLLC

Tony Oppegard